STATE OF ISRAEL, a sovereign nation, Plaintiff-Appellant,

v.

The MOTOR VESSEL NILI, etc., et al., Defendants-Appellees,

and

Singer & Friedlander, Inc., and Ted Curry Shipping, Ltd., Claimants-Appellants.

No. 27126.

United States Court of Appeals, Fifth Circuit.

Oct. 23, 1970.

Richard F. Ralph, Ralph & Boyd, Miami, Fla., for State of Israel.

Raymond T. Greene, Miami, Fla., for Singer & Friedlander.

William F. Parker, Miami, Fla., for Ted Curry Shipping, Ltd.

M. Lewis Hall, Jr., Hall & Hedrick, Miami, Fla., for Belcher Oil Co.

Eugene C. Heiman, Heiman, & Crary, Miami, Fla., for T. Arison & Co.

Richard E. Reckson, Arnold D. Schatzman, Aronovitz, Aronovitz & Haverfield, Miami, Fla., George E. Patterson, Jr., Turner & Patterson, John L. Britton, Feibelman, Friedman, Hyman & Britton, Arthur Roth, Miami, Fla., for Sea Host, Inc.

Before COLEMAN, SIMPSON and MORGAN, Circuit Judges.

SIMPSON, Circuit Judge:

The good ship M/V NILI makes its third voyage into this Court.[1] This trip the NILI's mortgagee, appellant-cross-appellee, State of Israel (Israel), brings a foreign ship mortgage foreclosure action[2] against the M/V NILI (NILI) and her fittings, herein appellee-cross-appellant, which generates an international multi-party lien priority race. The race was won-by entry of partial summary judgment in the district court-by the American lienors (American)[3], herein appellees, with Israel runner-up and the foreign lienors, Singer and Friedlander, Ltd. (Singer) and Ted Curry Shipping, Ltd. (Curry), herein appellants-appellees, eliminated as also-rans. T. Arison & Co., Inc. (Arison)[4], a fellow lien-intervenor with American, Singer and Curry did not take part in the contest in district court, but hopes to receive Section 951 status with American after the litigation

1. See State of Israel v. Metropolitan Dade County, Florida, 5 Cir. 1970, 431 F.2d 925 and Stern, Hays and Lang, Inc. v. M/V "NILI", 5 Cir. 1969, 407 F.2d 549. The *Metropolitan* case involved M/V NILI dockage fees while *Stern* was a lien intervention action. The holdings in these cases have no direct bearing on the case at bar.

2. Pursuant to Title 46, U.S.C. Section 951, as amended in 1954:

   § *951. Lien of preferred mortgage; foreclosure; jurisdiction; procedure; foreign ship mortgages*

   A preferred mortgage shall constitute a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel. Upon the default of any term or condition of the mortgage, such lien may be enforced by the mortgagee by suit in rem in admiralty. Original jurisdiction of all such suits is granted to the district courts of the United States exclusively. In addition to any notice by publication, actual notice of the commencement of any such suit shall be given by the libellant, in such manner as the court shall direct, to (1) the master, other ranking officer, or caretaker of the vessel, and (2) any person who has recorded a notice of claim of an undischarged lien upon the vessel, as provided in section 925 of this title, unless after search by the libellant satisfactory to the court, such mortgagor, master, other ranking officer, caretaker, or claimant is not found within the United States. Failure to give notice to any such person, as required by this section, shall not constitute a jurisdictional defect; but the libellant shall be liable to such person for damages in the amount of his interest in the vessel terminated by the suit. Suit in personam for the recovery of such damages may be brought in accordance with the provisions of subsection (c) of section 941 of this title.

   Foreign ship mortgages: As used in sections 951–954 of this title, the term "preferred mortgage" shall include, in addition to a preferred mortgage made pursuant to the provisions of this chapter, any mortgage, hypothecation, or similar charge created as security upon any documented foreign vessel (other than a towboat, barge, scow, lighter, car float, canal boat, or tank vessel, of less than two hundred gross tons) if such mortgage, hypothecation, or similar charge has been duly and validly executed in accordance with the laws of the foreign nation under the laws of which the vessel is documented and has been duly registered in accordance with such laws in a public register either at the port of registry of the vessel or at a central office; and the term "preferred mortgage lien" shall also include the lien of such mortgage, hypothecation, or similar charge: *Provided, however,* That such "preferred mortgage lien" in the case of a foreign vessel shall also be subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States. June 5, 1920, c. 250, § 30, Subsec. K, 41 Stat. 1003; June 29, 1954, c. 419, 68 Stat. 323.

3. Appellees, American lienors, represent the class of United States maritime lienors seeking the protection of the proviso of Section 951, as amended. See footnote 2, supra.

4. Arison is a New York corporation which commenced management of the NILI on September 16, 1966 pursuant to a written contract with Somerfin, the NILI owner, text, infra. Arison claims American's Section 951 status; however, at the time of this appeal the district court had not ruled on this claim.

is completed below.[5] On this appeal Arison lends moral support to American's Section 951 lien priority status.

The court below entered partial summary judgment [6] holding Israel's mortgage to be a valid preferred foreign ship mortgage as defined in Section 951, as amended.[7] In addition, the court held that Israel's posted lien preclusionary clause [8] embodied in its foreign ship mortgage was ineffective to alter the Section 953(a) (2) [9] and Section 951 claims. We approve the holding of the district court and affirm.

## I.

### Background

Although the record in this appeal comes to this Court piece-meal, confusing and sometimes incomplete [10] adequate relevant facts can be gleamed therefrom to throw light on the issues we must deal with.

On December 17, 1963, the Nili-Somerfin Car Ferries, Ltd.[11] (Somerfin), owner-mortgagor, contracted with Fairfield Shipbuilding and Engineering Company, Limited, of Govan, Glasgow, Scotland (Fairfield) for construction of the vessel M/V NILI.[12] Financing was arranged through the Bank of Scotland (Bank). Israel signed a guarantee contract with the Bank guaranteeing repayment of the Bank's construction loan to Somerfin. For Israel's guarantee promise, Somerfin executed a first mortgage on the NILI in Israel's favor.

After construction and delivery of the NILI to Somerfin, the mortgage and vessel were registered in Israel. The mortgage secured a series of sixty promissory notes from Somerfin to Israel. It was at this time that Somerfin commenced chartering the NILI for tourist travel from Miami, Florida, to the Bahama Islands. The first charter was to

5. Singer and Curry represent mainly foreign lienors outside the purview of Section 951, footnote 2, supra, and Section 953(a) (2), footnote, 9, infra.

6. The court's order only set forth relevant priorities; it did not discuss the validity or amount of each specific lien.

7. This holding carried with it district court jurisdiction under Section 951 to foreclose the foreign mortgage.

8. The lien preclusionary clause here in question appears in paragraph 5(d) of the mortgage:

The mortgagor hereby undertakes: (d) subject to the provision of this clause, not to sell or encumber the vessel temporarily or permanently * * * Equally important in this case is paragraph 5(f) of the mortgage:

The mortgagor hereby undertakes: (f) To exhibit in prominent form on one of the walls of the map room and in the captain's cabin in the vessel a printed notice in Hebrew and English stating that on this vessel a first mortgage has been granted in favor of the State of Israel, in accordance with the Shipping (Vessels) Law 5720–1960 of the State of Israel, and that under the terms of this mortgage the owner, employees of the vessel or their representatives have no right to create, grant or allow any encumbrance whatsoever on this vessel,

and to keep such notice exhibited as aforesaid at all times.

9. § 953. Preferred maritime lien; priorities; other liens

(a) When used hereinafter in this chapter, the term "preferred maritime lien" means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage. (Emphasis added)

The case comes to us on interlocutory appeal under Title 28, U.S.C. Sec. 1292 (b).

10. See Chief Judge Brown's comments concerning the vague nature of the record in Stern, Hays & Lang, Inc., footnote 1, supra.

11. A company incorporated under the laws of the State of Israel and having its registered office at 98 Ha'atzmaut Road, Haifa, in the State of Israel.

12. The agreement provided for 20 percent payment of the vessel's purchase price during construction and the remaining 80 percent upon delivery to the owner.

Tropical Cruise Line and was to expire on September 17, 1966.

On June 12, 1966, two of Somerfin's promissory notes were past due and unpaid. The Bank demanded and received payment from the guarantor, Israel. Israel then made a demand on Somerfin for payment but none was forthcoming.

Thereafter, in an endeavor to settle these obligations, numerous meetings were held between Israel and Somerfin. Somerfin's complete inability to pay came to light and talks of a NILI sale were entered into. No sale was ever consummated and the Somerfin obligations remained unpaid.

On September 17, 1966, Somerfin rechartered the NILI to Arison. During this charter period most of the liens involved here attached. On November 17, 1966, after accelerating the debt under the mortgage acceleration clause on November 8, 1966, Israel filed its suit to foreclose its mortgage. The NILI was bid in at foreclosure sale by Israel and the proceeds were ordered held in the registry of the district court. The sale only generated 4.20 million dollars whereas Israel's lien was for 8 million. As a result, if Israel is successful in establishing priority in this lien contest, none of the American and foreign lienors receive anything.

The district court summarized the claims as follows:

| | |
|---|---|
| (1) Israel | $ 8,014,644.00 |
| (2) Settled or dismissed | 76,349.21 |
| (3) Claims under 953(a) (2) | 82,000.00 |
| (4) American lienors under § 951 | 275,000.00 |
| (5) Foreign and other (Singer and Curry) | 451,000.00 |

Thereafter, during the pleading stages of this action, Israel and Dade Trading Corporation [13] filed motions for summary judgment raising the two major issues of this appeal:

(1) Is Israel's mortgage a preferred and valid mortgage within the purview of Section 951 under which the district court has jurisdiction to foreclose certain foreign ship mortgages?

(2) Is the lien preclusionary clause in Israel's foreign ship mortgage, (footnote 8, supra) by which the mortgagor-owner, Somerfin, agreed not to encumber the NILI, valid and effective?

In its order of May 18, 1968, considering these motions, the district court found the mortgage valid and enforceable, but held the lien preclusionary clause invalid and ineffective as to American. Thereafter, on November 4, 1968, the district court amended its May 18 order and certified the two summary judgment questions to this Court pursuant to Title 28, U.S.C., Section 1292 (b). Israel, Singer and Curry appealed from the November 4, 1968 order.

As a result of the partial summary judgment,[14] Israel's mortgage lien was subordinated to American's liens, causing a loss of $275,000 in Israel's recoupment of its mortgage outlay. Singer and Curry, as representatives of the foreign claims, were relegated to a position which shared in a non-existent fund. American and the Section 953(a) (2) claims assumed the priority position. On appeal, all appellants seek a reordering of these priorities.

## II.

### *Validity of Israel's Mortgage and Foreclosure Jurisdiction*

Singer, Curry and Arison raise many specious arguments contesting the validity of Israel's foreign ship mortgage and the United States district court's foreclosure jurisdiction. We find all of these contentions to be totally without merit and adopt the district court's rationale as set forth in its unpublished partial summary judgment opinion-order entered on October 18, 1968.[15] This leaves for our discussion the single issue of the

---

13. Dade Trading Corporation was one of the intervening U. S. lien libelants represented by American on this appeal.

14. See footnote 6, supra.

15. The applicable portions of the district court's opinion-order, with the relevant original footnotes appended is set forth as Appendix A to this opinion.

validity of the Israel mortgage's lien preclusionary clause and its effect on American's liens.

## III.

### *Lien Preclusionary Clause—Validity and Effect*

■ We do not think it was error for the district court to hold that Israel's lien preclusionary clause was ineffective here as not within the purview of Title 46, U.S.C. Sections 971–973, and especially 973.[16] Moreover, assuming validity, the lien preclusionary clause would not have the effect of relegating American to a non-maritime status.

Israel realizes that its preferred mortgage lien will be subordinated to American's maritime liens under the subordination proviso of Section 951, as amended, unless it can circumvent a literal reading of that section. The Section 951 proviso reads:

> *"Provided, however, that such 'preferred mortgage lien' in the case of a foreign vessel shall also be subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States."*

(Emphasis added)

Israel argues that its preclusionary clause is within the purview of Sections 971–973, especially 973, in the sense that these sections condition American's lien priority under Section 951 on the diligence used by American to learn of Israel's posted lien preclusionary clause. See footnote 16, supra.

Israel theorizes that the Section 973 language "for any other reason" and "the person ordering" contemplates a "lien preclusionary clause" and an "owner" of a vessel, thereby requiring diligence on the part of American. Israel advances this argument in the face of the expressed unconditional subordination language of the Section 951 proviso, supra. We agree with the district court that Israel's contention is answered convincingly by Tradewind, D.C. Md. 1956, 144 F.Supp. 408, 416–417.

In *Tradewind*, the court traced the history of Sec. 973 in relation to other provisions of the Ship Mortgage Act to show that Sec. 973 was not intended to include a preferred ship mortgage. The court said, 144 F.Supp., at page 417:

> "Section 973, when originally enacted as a part of the Federal Maritime Act, created an exception in favor of the vessel owner as against suppliers. If Congress had intended this section, upon its re-enactment as a part of

16. § 971. *Persons entitled to lien*

"Any person furnishing repairs, supplies, towage, use dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel".

§ 972. *Persons authorized to procure repairs, supplies and necessaries*

"The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel."

§ 973. *Notice to person furnishing repairs, supplies, and necessaries*

"The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; *but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained*, that because of the terms of a charter party, agreement for sale of the vessel, *or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."*

(Emphasis added)

the Ship Mortgage Act, 1920, to be *construed as extending this exception to holders of preferred mortgages* so as to require suppliers to make inquiry as to the authority of the owner to bind his vessel, the addition of a few words would have made such an intent clear. The careful amendment of Section 974 indicates that when Congress intended a former section of the Federal Maritime Lien Act to be extended to include a mortgage or a preferred mortgage, it used language clearly indicating such an intent." (Emphasis added)

and on page 419:

"Accordingly, this court holds that Section 973 was enacted and re-enacted as an exception in favor of the vessel owner and deals only with the authority of a third person to represent the owner so as to create a lien. It does not prevent the creation of a lien as such (the status of the lien being another matter) against the vessel by an owner in favor of a supplier irrespective of the prohibitory terms of any mortgage covenant made by the owner to the mortgagee. To hold otherwise would be to nullify the effect of other provisions of the Ship Mortgage Act, 1920, in that a ship's mortgage which failed to comply with the procedural requirements of the Act, necessary to achieve the status of a preferred mort-

gage could nevertheless not only gain priority over the supplier's claim but would relegate it to a non-maritime status where the supplier knew, or with due diligence could have learned, of the terms of the mortgage."

We adopt the reasoning of *Tradewind* and hold that Section 973 was not intended to encompass such lien preclusionary clauses as the one here involved, resulting in validation of the clause. Assuming arguendo, as did the district court, that Israel's lien preclusionary clause is valid, the result is not to relegate American to a nonmaritime lien status. Even where a valid lien preclusionary clause exists, this result would be contrary alike to the history and purpose of Section 951, as amended, and to the equitable doctrine of "clean hands." Neither logic nor pertinent authority allow the absurd consequences this would entail.

Prior to 1954, the Ship Mortgage Act did not allow the foreclosure of foreign ship mortgages under Section 951. However, in 1954, Section 951 was amended by adding the second paragraph which allows foreclosure of foreign mortgages upon an express condition of *subordination* to maritime liens for supplies furnished in the United States. The reports of both the House and Senate reflect the importance of this *conditional* grant of jurisdiction.[17]

17. See the following:

(a) H.R.Rep. No. 6276, 83rd Cong. 2d Sess., 2–3 (1954) letter from Secretary of Interior Sinclair Weeks:

"When thus providing a forum on the admiralty side of the United States courts in the enforcement of defaulted foreign mortgages, the bill does not give these foreign ship mortgages the same order of priority over subsequent repair and other liens given under existing United States laws *to preferred ship* mortgages on United States flag vessels. A proviso at the end of the bill provides that, in case of mortgages on foreign vessels, the mortgage lien shall be subordinated to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries. Under existing United States law, pre-

ferred mortgage liens on United States flag vessels come ahead of maritime liens for repairs, supplies, and necessaries furnished subsequent to the mortgage liens. On the other hand, the bill improves the position of the holder of a mortgage on a foreign vessel, for under existing United States law he may only foreclose in an equity proceeding in the United States court and in such case the mortgage lien is subordinate to all maritime liens.

" * * * Thus, while the bill does not give the holder of a mortgage on a foreign vessel the same preference or priorities as the holder of a mortgage on a United States vessel, it provides him an expeditious foreclosure proceeding and takes away no procedural or substantive right which he now has".

We do not believe, as Israel urges, that Congress sanctioned the use of Section 973 to create a valid lien preclusionary clause which would effectuate the defeat of the protective subordinating proviso of Section 951. It may appear harsh to subordinate the lien preclusionary clause of Israel's mortgage—of which there was either actual or constructive notice—but our views may not be substituted for the clearly delineated intent of the Congress. In another context, Mr. Justice Cardozo eloquently referred to the duty to exercise judicial restraint when he wrote: "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take this statute as we find it." [18]

Absent conflict with the Constitution, Congress must be free to delimit jurisdiction of courts created by it in offering through them a remedy to foreign litigants. The limitation to the conditional jurisdiction granted in Section 951 clearly was placed there to protect liens of American shipyards and suppliers.

Additionally, the foreigner petitioner, Israel, comes into court with "unclean hands". The facts in this case appear not to justify an extension of the

(b) H.Rep. No. 1662, 83rd Cong., 2d Sess. 2–3 (1954):

"The Committee on Merchant Marine and Fisheries, to whom was referred the bill. (H.R. 6276) to amend the Ship Mortgage Act, 1920, as amended, having considered the same, report favorably thereon with amendment and recommend that the bill do pass.

'The purpose of this bill is to furnish a suitable remedy in the courts of the United States for the enforcement of ship mortgages on foreign-flag vessels.

"Prior to enactment of the Ship Mortgage Act of 1920, all ship mortgages were regarded by the United States courts as nonmaritime and, therefore, suits to foreclose did not come within the jurisdiction of the admiralty courts. A ship mortgagee seeking to foreclose a defaulted mortgage was obliged to resort to the complicated and ill-suited remedies available in courts of equity or common law courts.

"In 1920 the Congress passed the Ship Mortgage Act (41 Stat. 1000 et seq.), providing that if certain procedural requirements were followed, the mortgage should constitute a 'preferred mortgage'. The lien of such 'preferred mortgage' was made a 'maritime lien' and jurisdiction to foreclose such a mortgage was given to the admiralty courts. The Ship Mortgage Act, however, applied only to American-flag vessels, and required the mortgagee as well as the mortgagor to be American citizens. As a result of the act, American vessels became much more acceptable as security and a proceeding brought in an admiralty court of this country to foreclose such mortgage confers upon the purchaser at a judicial sale a· title free and clear of maritime liens, good against the world.

"But the Ship Mortgage Act at present offers no remedy to American holders of mortgages on foreign-flag vessels. This bill is designed to correct the situation by extending the term 'preferred mortgage' as used in the Ship Mortgage Act to mortgages on foreign vessels when duly executed and registered in accordance with the laws of the foreign nation under which the vessel is documented. *However, in order to provide assistance for American suppliers of goods or services to the foreign vessel, the Department of Commerce recommended that the bill be amended to provide that the preferred mortgage on a foreign vessel be subordinate to the lien of American suppliers. This amendment was adopted by the committee and appears in the bill as reported*". U.S.Code Cong. & Admin. News 1954, p. 2451. (Emphasis added)

(c) S.Rep. No. 1219, 83rd Cong., 2d Sess. 3–4 (1954), letter from Attorney General William P. Rogers:

"The proviso in the bill, subordinating the mortgage lien in the case of foreign vessels to the liens of suppliers, appears to have been written to meet the objection of drydock and repair yard owners in the United States. They assert that in the short time available in their business, their facilities for discovering the existence of a foreign ship mortgage are not adequate as is the case with American-flag vessels. They ask, therefore, that their liens for repairs, supplies, towage, use of drydocks, or marine railway, or other necessaries, should be prior to the mortgagee's claim where mortgages of foreign ships are involved."

18. Anderson v. Wilson, 289 U.S. 20, 27, 53 S.Ct. 417, 420, 77 L.Ed. 1004 (1933).

conditional jurisdiction of the Section 951 proviso. Israel and Somerfin, prior to the rechartering of the NILI to Arison, met repeatedly to discuss Somerfin's inability to meet the mortgage obligations. Despite this, Somerfin rechartered the NILI to Arison with Israel's knowledge. It took no crystal ball in this situation to foresee that NILI was likely to leave numerous lien claims in its wake. Israel was free to accelerate and foreclose the ship's mortgage when it chose, and we do not criticize its attempts to work out its mortgagor's difficulties with Somerfin. Nevertheless, had foreclosure occurred prior to the Arison recharter, the lien priority Donnybrook would have been avoided. This circumstance has its place in the balancing of equities.

Applicable case law supports our conclusion. In Morse Dry Dock & Repair Co. v. The Northern Star [19] the Supreme Court held in construing Section 973 that maritime liens for supplies ordered by the owner of a vessel cannot be relegated to non-maritime status by a lien preclusionary clause in a mortgage. The Court said:[20]

> " * * * When supplies are ordered by the owner the statute (Section 973) does not attempt to forbid a lien simply because the owner has contracted with a mortgagee not to give any paramount security on the ship."

As the district court pointed out, this holding in *Northern Star* has been criticized as dictum,[21] but we agree careful reading of *Northern Star* refutes such a criticism.

Factually, *Northern Star* was a lien *priority* contest between an American ship mortgage containing a lien preclusionary clause and an American supplier's lien, but the court had first to decide the *effect* of the lien preclusionary clause

before determining priority. If the effect of the lien preclusionary clause was to destroy the supplier's lien decision of the priority issue would have been unnecessary. The court held that the lien preclusionary clause neither destroyed maritime liens nor relegated them to non-maritime lien status by precluding supply lien attachment. This analysis of *Northern Star's* holding is that accepted by numerous holdings of other federal courts since *The Bergen*, supra, was decided.[22]

Israel urges that *Northern Star* has been misread and that the real holding deals only with a lien "subordinating" clause which does not preclude the creation of subsequent liens, but merely makes them junior to the mortgage. Assuming the correctness of this narrow reading (as we refuse to do), the fact remains that the court impliedly set forth a considerably broader principle: regardless of whether or not the mortgage contains a lien "preclusionary" or subordinary clause, a mortgagor's contract with a mortgagee not to give any security against the ship cannot forbid a lien of a supplier from attaching. Section 973 simply does not sanction destruction of maritime liens in either a "preclusionary" or "subordinary" situation.

Taking a different tack, Israel further asserts that Section 951 only contemplates alien "subordinating" clauses and not "preclusionary" clauses. To construe Section 951 in this light would again be (see above) a contravention of the conditional jurisdictional limitation of Section 951, put there by Congress. All any foreign mortgage parties would have to do to circumvent the congressional purpose would be to label their clause "preclusionary" vice "subordinating". Having reached the view that courts are powerless to extend arbitrarily the limit-

19. 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082 (1926).

20. Id. at 554, 46 S.Ct. at 590.

21. The Bergen, D.C.Cal.1931, 50 F.2d 447, 448, reversed 9 Cir. 1933, 64 F.2d 877.

22. International Refugee Organization v. Maryland Drydock Co., 4 Cir., 1950, 179 F.2d 284; The Bergen, 9 Cir. 1933, 64 F.2d 877 reversing S.D.Cal.1931, 50 F.2d 447; Rockport Yacht and Supply Co. v. M/V Contessa, D.C.Tex.1962, 209 F.Supp. 396; The Tradewind, supra.

ed jurisdiction granted under the amendment to Section 951, we have no difficulty in declaring that two foreign parties may not do so by private agreement.

Israel's final contention is that the language of the court in Point Landing, Inc. v. Alabama Dry Dock and Shipbuilding Co., 5 Cir. 1958, 261 F.2d 861, 867, and Pascagoula Dock Station v. Merchants and Marine Bank, 5 Cir. 1959, 271 F.2d 53, 55, supports its position that the lien preclusionary clause under the Section 973 sanction can effect a destruction of the American liens. This reliance is misplaced, because the language relied on in both cases is at most pithy dicta. In *Point Landing,* the court did not decide the effect of a lien preclusionary clause on a maritime lien. It held only that the appellant had a right to intervene. In *Pascagoula,* the court held that a preferred ship mortgage was not invalid because of the mortgagee's failure to insure that suitable notice thereof was posted aboard the vessel.[23] The *Pascagoula* court was not called upon to rule on the question of whether or not a lien preclusionary clause with notice can relegate maritime liens to the status of non-maritime liens.

Israel has failed to convince us, by case authority or otherwise, that, assuming the presence of a valid lien preclusionary clause, the effect of such a clause would be destructive of American's protected Section 951 maritime liens.

To recapitulate, we hold that the district court correctly found that Israel had a valid preferred foreign ship mortgage within Section 951, as amended; that Section 973 does not sanction the lien preclusionary clause; and that even if

it did, this would not destroy American's liens. We add only that our convictions are supported by consideration of the effect of an opposite holding. The result would be approval by this court of expansion by two foreign parties by private agreement of the Section 951 jurisdictional limitation. Occasionally courts find themselves hard put to provide a clear answer by logical deduction or inductive abstraction, and are forced to balance consequences. This never requires that we embrace absurd consequences.

The judgment appealed from is in all respects

Affirmed.

### APPENDIX A

Throughout this lengthy litigation numerous objections have been made to the validity of the mortgage and this Court's jurisdiction to foreclose that mortgage. A hearing on May 29, 1968 materially clarified and limited these objections. At that hearing the lienors conceded the proper registration and recordation of Israel's mortgage.[8] The lienors did urge four other objections to the validity of the mortgage.

### A. Acceleration of the Secured Debt

The lienors argue that there never was an acceleration of the secured debt and at most Israel can only recover amounts actually paid under the Guarantee to the Bank. Exhibit 10 attached to Israel's motion for summary judgment clearly answers this objection. Exhibit 10 is a letter from the Accountant General of Israel to the Owner-Mortgagor dated

23. *Pascagoula* involved both a question of mortgage validity and priority. The holding referred to in the text was restricted to the validity question, but this is the area of the *Pascagoula* opinion from which Israel gets its dicta that a lien preclusionary clause with notice can destroy all maritime liens.

8. This concession solves any problem that may arise under the following underlined language of Sec. 951:

[T]he term 'preferred mortgage' shall include * * * any mortgage, hypothecation, or similar charge * * * if such mortgage, hypothecation, or similar charge * * * *has been duly registered in accordance with such laws* (laws of the country of the vessels documentation) *in a public register either at the port of registry of the vessel or at a central office* * * *

November 8, 1966. In this letter Israel notified the Owner-Mortgagor of Israel's election under clause 13A of the mortgage [9] (the acceleration clause) to demand the full sum of the remaining indebtedness. This was certainly sufficiently to accelerate the indebtedness. In addition, in the complaint, Israel again demands and declares the whole of the guaranteed amounts as due.[10]

The record clearly shows the acceleration of the secured debt.

### B. Authority of Israel to Guarantee the Debt of a Private Corporation

The lienors also argue there is no showing of Israel's authority to guarantee the debt of a private corporation. Thus, both the guarantee and the mortgage arising out of it are ultra vires and of no effect.

The record contains evidence of Israel's authority to guarantee this private debt. The Guarantee attached to the Complaint as Exhibit II and executed by the Minister of Finance of Israel recites his power and authority to execute the guarantee and refers to explicit enabling legislation.[11] The Complaint (R–360) alleges that the Guarantee was duly executed and delivered and that the mortgage was "duly and validly executed in accordance with the laws of the State of Israel.[12] The Complaint is sworn to by the Accountant General of Israel (Dov-Ben Dror) in a separate affidavit.[13] In addition, the legal Advisor to the Ministry of Finance of the State of Israel, Elhanon Landau, recites in an affidavit that "the Ship's Mortgage Deed and the documents attached thereto * * * were duly validly executed and duly registered in accordance with the applicable law of the State of Israel.[14] A careful study of the voluminous documents submitted in support of Israel's motion for summary judgment proves the authority of Israel to execute this guarantee. The whole history—documentary and factually—of this case shows that a major foundation of these transactions was the power of Israel to execute the guarantee here in question. In light of this factual and documentary background the affidavits and the complaint take on an added evidentiary significance.

In the face of this evidence supporting Israel's authority to guarantee the Owner-Mortgagor's private debt, the lienors boldly raise the general and unsupported objection that there is no such authority. This objection fails for two reasons. First, the objection is insufficient under Federal Rule 56(e). Israel has supplied affidavits and comprehensive, detailed documents tending to show its authority to execute the guarantee. The lienors have supplied nothing. Rule 56(e) places a burden on the lienors; they have not met it.

The second reason the objection fails is the presumption of regularity of a public officer's official acts.[15] The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.[16] This pre-

---

9. The mortgage is attached to the complaint as Exhibit I and to the motion for summary judgment as Exhibit B–1 and B–2.

10. Paragraph 14 of the Complaint.

11. The Guarantee on page 2 reads: "[I], the Minister of Finance of the Government of Israel, acting on behalf of the State of Israel by virtue of the powers conferred upon me by the State Guarantees Law 5718–1958 and with the approval of the Finance Committee of the Kenesset, DO HEREBY GUARANTEE * * *"

12. Paragraph 6 and 11 of the Complaint.

13. This affidavit was filed on February 15, 1967. (R–379)

14. Exhibit 15 with Israel's motion for summary judgment.

15. The same reasons that warrant the use of presumptions at trial warrant their use in a motion for summary judgment. Becker v. Safelite Glass Corp., 244 F. Supp. 625 (D.Kan.1965); 6 J. Moore Federal Practice Sec. 56.11(10) (2d ed. 1953).

16. United States v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926). See also Sabin v. United States, 44 F.2d 70, 70 Ct.Cl. 574 (1930).

sumption applies to the acts of foreign officials as well as American.[17] No evidence was offered by the lienors to this legal presumption in favor of Israel's official acts and thus the presumption stands unrebutted.

For the above reasons, I find that the State of Israel had authority to guarantee the Owner-Mortgagor's private debt.

### C. Is the Lien of the Mortgage of Maritime Lien?

The lienor's third objection is based on the fact that the debt secured here was a shipbuilding loan. The lienors argue that the guarantee and mortgage grew out of the shipbuilding loan and can be in no better position that the loan. Since a shipbuilding contract under American admiralty law does not create a maritime lien, the lienors argue that the lien of Israel's mortgage is not a maritime lien. This objection is based on three unstated assumptions: (1) that the normal admiralty rule concerning shipbuilding contracts applies to the lien of a preferred ship's mortgage under the Ship Mortgage Act,[18] (2) that American admiralty law controls in classifying Israel's mortgage lien as maritime or non-maritime, and (3) that the Israeli mortgage lien must have maritime status in order to be treated as a preferred mortgage lien under the Ship Mortgage Act. Their first two assumptions are false and the objection must therefore fail.

Detroit Trust Co. v. Steamer "Thomas Barlum"[19] scuttles the first assumption. In that case the Supreme Court held that the maritime status of the preferred mortgage lien was conferred by the statute and was not controlled by the actual use of the funds secured by the mortgage. But this negation of the first assumption becomes unimportant in light of my refusal to accept the second assumption concerning the choice of the applicable law. Section 951 of 46 U.S.C. states in part:

> [T]he term "preferred mortgage" shall include * * * any mortgage, hypothecation, or similar charge created as security upon any documented foreign vessel * * * if such mortgage, hypothecation, or similar charge has been *duly and validly executed in accordance with the laws of the foreign nation* under the laws of which the vessel is documented and has been duly registered in accordance with such laws * * * (emphasis added).

The language of Sec. 951 clearly requires application of Israeli law in construing and interpreting Israel's mortgage. The second assumption must therefore fail.

The decision to apply Israeli law brings me to the third assumption which is now better stated in the form of a question. Must the Israeli mortgage have maritime lien status under Israeli law in order to be treated as a preferred mortgage under the Ship Mortgage Act? A negative answer is preferrable since it is a literal interpretation of Sec. 951. Section 951 contains no requirement that the "mortgage hypothecation, or similar charge" have maritime lien status under the foreign law. The statutory language "or similar charge" is broad enough to encompass foreign mortgages of non-maritime lien status.

While a negative answer is preferrable, for the sake of completeness I will assume the opposite.[20] A positive answer requires the foreign mortgage to have maritime lien status in the country of documentation. This answer requires analysis of Israeli Law.

17. United States v. King, 44 U.S. (3 How.) 773, 785–786, 11 L.Ed. 824 (1845); Boissonnas v. Acheson, 101 F.Supp. 138 (S.D.N.Y.1951).

18. Originally passed in 1920 and now codified as 46 U.S.C. Secs. 911–984.

19. 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934).

20. These two possible answers are discussed in G. Gilmore & Co. Black, Admiralty, Sec. 9–51 p. 579 (1957)

Israel's Shipping (Vessels) Law, 5720–1960 [21] enjoys a clarity and completeness which perhaps can only be achieved in a new country where the drafters are not troubled by hoary·legal precedents or haunted by the traditions of a long past era. Section 55 of Chapter 5 of the Israeli Law reads in part; [22]

> The owner of a vessel registered under this law or the owner of a share in a vessel * * * may mortgage his right in the vessel as security for an existing, future or contingent liability by the drawing up of a mortgage deed and its registration under this law.

Section 72 of Chapter 5 states in part: [23]

> Where any of the conditions of the mortgage deed in nonfulfillment of which confers the right of realization has not been fulfilled, the mortgagee may institute before the court [the maritime Court] an action in rem for the realization of the mortgage, and in such an action the court may (1) make an order for the sale of the vessel or the mortgaged share * * *

There is nothing in these sections which prohibits securing a shipbuilding loan by a mortgage. The language of Section 55 is clearly broad enough to cover such a mortgage. In addition, a close scrutiny of other statutory provisions reveals that this type of mortgage was clearly contemplated and intended by the statute. Section 4 of Chapter 2 deals with registration of vessels and reads: [24]

> A vessel under construction in Israel or abroad which fulfills the conditions of eligibility mentioned in Section 2 [a vessel more than half of which is owned by an Israeli corporation is eligible for registration] * * * may be registered * * * and upon being

so registered it shall be deemed to be a vessel unless the contrary intention appears.

As pointed out, Section 55 of Chapter 5 allows "the owner of a *vessel registered under this law*" (emphasis added) to mortgage his right in the vessel. Considering Section 4 and 55 together it is clear that the statute allows a vessel under construction to be registered and mortgaged. These provisions clearly intended to allow a shipbuilding loan to be secured by a maritime mortgage on the vessel while it is still under construction. Considering the statute as a whole it is clear that the instant mortgage has maritime lien status under the laws of Israel.

In conclusion, the lienor's third objection fails because Israeli, law, not American law, controls the classification of this mortgage. Further, the objection fails because there is no requirement in Sec. 951 that the foreign mortgage be maritime in status. And finally, even if there was a requirement of maritime status, this requirement is met since the instant mortgage is clearly of maritime lien status under Israeli law.

**D. Does This Court Have Jurisdiction To Foreclose a Foreign Ship Mortgage Held by a Foreign Mortgagee?**

This lienors' final objection is that this Court does not have jurisdiction to foreclose this mortgage. There is no question that an *American Mortgagee* can foreclose his mortgage under Sec. 951. But the lienors argue that a *foreign mortgagee* cannot use Sec. 951 to foreclose his mortgage.

The statutory language of the 1954 Amendment contains no requirement that the mortgagee be a United States citizen.[25] The lack of such a requirement

21. Passed by the Kennesset on the 11th Av., 5720 (August 4, 1960) and published in Sefer Ha-Chukkim No. 315 of the 21st Av., 5720 (August 14, 1960), p. 70; the Bill and an Explanatory note were published in Hatza ot Chok No. 392 of 5720, p. 338.

22. Laws of the State of Israel, Vol. 14, 5720–1960 p. 72, [Hereinafter Laws of Israel].

23. Laws of Israel, p. 76.

24. Laws of Israel, p. 61.

25. For a clear statement of this view of the statute see Rederiaktierbolaget v. Compania de Navegacion, 139 F.Supp. 327, 336 (Canal Zone 1955).

**254**

takes on added significance when the statutory history is considered. The Ship Mortgage Act of 1920 limited preferred mortgages to mortgages held by American mortgagees. 46 U.S.C. Sec. 922(a)(5) explicitly required the mortgagee to be a United States citizen. But the 1954 amendment to Sec. 951 does not mention the mortgagee's nationality in defining the new class of preferred ship mortgages. Considering the two statutory provisions together, the clear inference is that the deletion of a citizenship requirement in the 1954 amendment was intentional.

A study of the policy considerations before Congress shows that foreign mortgagees are within the statute. The primary concern of Congress in enacting the amendment was to provide the United States government with an efficient method for enforcing its mortgages on foreign vessels.[26] These mortgages resulted from the United States government's sale of surplus World War II vessels. But Congress was also concerned with the international ramifications of amendment.[27] The hearings show Congress's sympathy with international attempts toward uniformity in establishing a suitable forum for the enforcement of all properly executed and registered mortgages regardless of the mortgagee's nationality.[28]

Finally, and most importantly, the Fifth Circuit has clearly held foreign mortgages within the statutes.[29]

Considering the judicial authority, the clear statutory language, and the legislative history, Israel can foreclose its mortgage under Sec. 951.

26. At the time of the amendment the United States government had outstanding 371 of these mortgages totaling $116,-870,476.33. Hearings on H.R. 6276 Before the Committee on Merchant Marine and Fisheries, 83rd Cong. 2d Sess., 11 (1954) [Hereinafter Hearings on H.R. 6276].

27. Mr. Prizer of the Maritime Association of the United States in testifying before the House Committee stated:

There is an international phase of this, too. We have been working with foreign associations for several years to obtain, insofar as possible, uniformity in other countries. There are foreign countries today which will enforce foreign ship mortgages, not only for their own citizens but for other citizens, too. Other countries, particularly Great Britain, do not. Great Britain's (R–380) law, for all practical purposes, is similar to our own now. But the secretary of the English Maritime Law Association has had the matter up, as I understand, before members of the judiciary before whom justice bills originate, and then there is a strong indication if our bill has passed we will get a similar result in Great Britain, which would be very beneficial to the United States Government and American mortgages in that if vessels could not be found in this country and could be found in England, there would be a remedy there.

*Hearings on H.R. 6276* at 5. See also *S.Rep.* No. 1219, 83rd Cong. 2d Sess. 5 (1954).

28. This view is expressed in Rederiaktierbolaget v. C. Compania de Navegacion, 139 F.Supp. 327, 336 (Canal Zone 1955). A further indication of the "international phase" of the amendment is that except for the proviso, and the lists of types of vessels excluded the amendment copies Article I of the Brussels Convention of 1926 for the Unification of Certain Rules of Law Relating to Maritime Liens and Mortgages. An English translation of the convention is contained in 6 A. Knauth, Benedict on Admiralty 383 (1958).

29. Tropicana Shipping, S.A. v. Empresa Nacional "Elcano,", 36 F.2d 729 (5th Cir. 1966); Brandon v. S.S. Denton, 302 F.2d 404 (5th Cir. 1962).