596 F.2d 515
 GULF OIL TRADING COMPANY, Plaintiff-Appellee,
v.
CREOLE SUPPLY and Creole Shipping Ltd., in personam, and the
freights and charterhire of the M/V PYRAMID VIKING
and M/V PYRAMID VETERAN, in rem, Defendants,
v.
The CHASE MANHATTAN BANK, Defendant-Appellant.
 No. 225, Docket No. 78-7276.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 30, 1978.
Decided Feb. 26, 1979.
On Rehearing April 25, 1979.
On Petition For Rehearing
 
 John J. Reilly, New York City (Gary D. Sesser, Haight, Gardner, Poor & Havens and Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for defendant-appellant.
 Robert J. Zapf, New York City (Burlingham, Underwood & Lord, New York City, of counsel), for plaintiff-appellee.
 Before MOORE, FRIENDLY and GURFEIN, Circuit Judges.
 GURFEIN, Circuit Judge:
 
 
 1
 The District Court for the Southern District of New York (Hon. Charles L. Brieant) entered judgment after a non-jury trial for $294,310 in favor of Gulf Oil Trading Company ("Gulf") against the Chase Manhattan Bank, N.A. ("Chase"), by imposing a constructive trust on freights and proceeds arising from the sale of two vessels, M/V PYRAMID VIKING and M/V PYRAMID VETERAN ("the vessels"), upon foreclosure in the Bahamas of the Chase preferred ship mortgage.
 
 
 2
 The admiralty jurisdiction of the District Court was invoked by plaintiff Gulf. Gulf sued Chase, the mortgagee of the two vessels. Count I of the complaint sought to impose a constructive trust on freights and proceeds of sale for $301,100.43 for fuel oil supplied to the vessels from January to May 1976 and to assert a maritime lien for Gulf and other creditors. Count II of the complaint was In personam and sought to recover $76,352.44 from Chase for bunkers supplied for the last voyages of the vessels. It was based on a theory of express contract.
 
 
 3
 Judge Brieant gave judgment for Gulf for the full net amount of the proceeds of the foreclosure sale and freights in the sum of $294,310 by imposing a constructive trust on such proceeds and freights. Several theories were advanced by Gulf to support the full recovery: (1) that Gulf had a maritime lien on freights earned on the last voyage; (2) that Gulf is entitled to an equitable lien on these freights; (3) that Chase expressly agreed to pay for the oil delivered for the vessels' last voyages; and (4) that Gulf is entitled to a constructive trust on the freights and proceeds of sales of the vessels. We affirm the judgment for Gulf in the amount of $76,352.44. We reverse the balance of the judgment for the price of bunkers supplied earlier.
 
 
 4
 Though the complaint was framed as a claim for relief in admiralty, it appears that, so far as the In personam claim is concerned, there is jurisdiction by virtue of diversity of citizenship. 28 U.S.C. § 1332. Gulf is a Delaware corporation with its principal place of business in Pennsylvania. Chase is a national banking association with its principal place of business in New York City. Creole Supply, Inc. is a Louisiana corporation through which supplies for the vessels were obtained and whose principal place of business is presumably in Louisiana. Creole Shipping Ltd. ("Creole") is a Bahamas corporation with a registered office at Nassau, Bahamas. The vessels were of Nassau registry. The Creole defendants were not served, and there is no alignment of parties that would defeat diversity jurisdiction.
 
 
 5
 The District Judge found the following facts. Creole Shipping owned the vessels, which carried bulk cargo as "tramp" steamers (I. e., vessels which operated without designated routes at the behest of shippers). Creole Shipping, together with Creole Lines Ltd., a Bahamian corporation which is not a defendant, borrowed five million dollars from Chase on April 1, 1974 for the purchase of the VIKING, to pay outstanding debts of Creole, and to provide working capital. The loan was secured by the joint and several promissory notes of the Creole companies, by mortgages on the vessels, as well as by mortgage on the M/V PYRAMID VENUS owned by Creole. The loan was also secured by a general assignment of freights earned and to be earned, as well as by joint and several guarantees from certain of Creole's shareholders.
 
 
 6
 The loan principal was to be repaid in four installments of $1,250,000 each, due on August 31, 1974, November 30, 1974, February 28, 1975 and May 31, 1975, with interest.
 
 
 7
 The mortgage on each vessel was to be a "(s)tatutory mortgage with first priority for an account current on the Vessel," and the loan agreement provided that the shipowner would comply with Bahamian law "to establish and maintain the Mortgage as a first preferred mortgage upon the Vessel and upon all renewals, improvements and replacements made in or to the Vessel." It was also provided that no lien whatsoever other than for crew's wages would be permitted to be placed upon the vessels, with the further requirement that the shipowner would keep certified copies of the loan and mortgage documents on board the vessels and display them to any party who might do such business with the vessels as to give rise to a lien on the vessels and/or her freights. A notice of mortgage was required to be displayed prominently in the chart room and master's cabin. The mortgages were also to be recorded with the vessels' documents of registry. In addition, the shipowner undertook to discharge all liens within thirty days after the charges became payable.
 
 
 8
 The obvious purpose of these provisions was to create a legal situation in which maritime liens would be precluded by notice of the prior lien of the preferred ship mortgage. This preclusion had limited effectiveness, however, because the Ship Mortgage Act, 46 U.S.C. § 951, provided by the 1954 Amendment that a "preferred mortgage lien" in the case of a foreign vessel shall be subordinate to maritime liens for repairs and necessaries performed or supplied in the United States. See G. Gilmore & C. Black, The Law of Admiralty § 9-70 (2d ed. 1975).
 
 
 9
 A so-called "lien preclusionary clause," such as the one here, has been held to be ineffective against maritime liens of American suppliers of necessaries to foreign vessels. State of Israel v. M/V NILI, 435 F.2d 242, 246-50 (5th Cir. 1970), Cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971) (applying Morse Drydock & Repair Co. v. THE NORTHERN STAR, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082 (1926), to the foreclosure of foreign ship mortgages provided in the 1954 Amendment).
 
 
 10
 Accordingly, if the foreign preferred ship mortgage were to be foreclosed in the United States, the supplier of bunkers necessary to the operation of the vessel would prevail over the mortgagee. Chase knew this and ordered the shipowner who was in default to take the vessel out of the jurisdiction of the United States. And thereby hangs this tale.[1]
 
 
 11
 Gulf and Chase never had any direct communication about the vessels. Mortgagee and supplier each went its separate course.
 
 
 12
 Chase's course of action was described by Judge Brieant in the following terms:
 
 
 13
 In order to receive the freights according to the terms of the Assignment, cash collateral accounts for each vessel were established at Chase. All freights were paid by shippers directly into those accounts. Creole had no signature authority over the accounts. Chase debited the accounts as loan principal and interest payments became due, and released funds as required to cover operating expenses of the vessels. On several occasions Chase wire-transferred funds from Creole's cash collateral accounts to pay for bunkers supplied to the vessels by Gulf.
 
 
 14
 The method employed was for Creole to request Chase by telegram for a release of funds which, if granted, was carried out by direct transfer to the account of Gulf in a Philadelphia bank.
 
 Gulf's course of action was as follows:
 
 15
 When Gulf initially began to supply bunkers to the Creole vessels, the credit terms required that payment be made within 30 days from the invoice date. Late in 1975 Gulf changed those credit arrangements because Creole's account was extended beyond the original credit terms. Under the new arrangement, Creole was to pay cash for the bunkers before their delivery to the vessel. Keeler (a Chase representative) testified that he knew of this arrangement.
 
 
 16
 Gulf was not paid for the bunkers for the vessels' last voyage.
 
 
 17
 In the meantime, Creole had defaulted in payment of the Chase loan in February 1975. After the default, the freights collected were insufficient to bring the outstanding loan payments up to date. Chase, nevertheless, continued to release funds to operate the vessels, as the court found, "in the hope that refinancing negotiations being held during the default period would prove successful, thereby avoiding foreclosure of the mortgages." Chase gave no notice to anyone that the vessels were in default.
 
 
 18
 The negotiations having proved unsuccessful, Chase notified Creole on May 14, 1976 that the loan was being called immediately. On May 18, 1976, Chase applied the balances in the cash collateral account against the outstanding debt. The amounts applied to the outstanding debt of $1,900,000 were $122,758.27; $94,940.02; and $4,194.32.
 
 
 19
 Chase, which now controlled the vessels for all practical purposes, permitted them in these circumstances to leave the United States with cargo destined for the Dominican Republic. When they got there the vessels were arrested by Chase. Thereupon, Pyramid Marine, Inc., the operating agent of the vessels, requested that Chase release the arrested vessels. It did so, and permitted the VETERAN to sail to the Bahamas and the VIKING to sail to Jamaica, to discharge additional cargo, and thence to the Bahamas. The District Court found that the sole reason for sailing to the Bahamas was that Chase had been advised that Dominican Republic law was " 'so antiquated that it would take forever and forever to get it (the mortgage foreclosure) through the courts.' " It found that Chase believed Bahamian law to be more favorable, so that a foreclosure there would be speedier and less costly.
 
 
 20
 The court found specifically that a condition of the release of the vessels was that they would proceed to the Bahamas, and that their masters would be irrevocably ordered to go there. The vessels did proceed to the Bahamas and were again arrested by Chase. This time the mortgages were foreclosed, resulting in a judicial sale of the vessels and the receipt of the proceeds of sale by Chase, as mortgagee, in the approximate net amount of $738,000.[2] There is no evidence that maritime liens would have been given priority over the mortgage under Bahamian law.
 
 
 21
 The cardinal finding below was "that the vessels needed fuel to leave United States ports, that Chase desired to have the vessels leave the United States in order to avoid their arrest by other creditors, and that Chase benefitted by having the vessels leave the United States with cargo destined for the Dominican Republic and with fuel supplied by Gulf."
 
 
 22
 Chase does not contend that the findings of fact were clearly erroneous and we accept them as the basis for decision.
 
 
 23
 Gulf's claim is in two parts: (1) a claim In personam for the price of the bunkers supplied for the final voyages under the circumstances described; and (2) a claim initially asserted on behalf of all creditors for the proceeds of the foreclosure sale and freights, to reimburse Gulf for all the bunkers previously supplied for which it had not been paid.
 
 
 24
 * The claim for payment of the bunkers for the last voyages, $76,352.44, is the limit of Gulf's claim in Count II based on jurisdiction In personam. The theory of the complaint is that Chase expressly agreed to see that payment would be made for these bunkers. Though the District Court found no express agreement by Chase to pay for these bunkers lifted by the vessels on April 28 and May 7, 1976, it did find that "(i)n light of the established practice between Creole and Chase for the release of funds and Chase's desire to have the vessels sail from United States ports, Chase would have been likely to make such an express promise had it been asked to do so." The District Court concluded that since Chase had benefited from the bunkers supplied by Gulf, a failure to pay Gulf resulted in an unjust enrichment of Chase. The court imposed a constructive trust on the freights and proceeds of the foreclosure sale on a mixed theory based upon unjust enrichment and upon the destruction of a maritime lien by Chase which Gulf would otherwise have had. This combination of theories led to the imposition by the District Court of a constructive trust upon the freights and the proceeds of sale for all the money owed Gulf.
 
 
 25
 We hold that it is unnecessary to resort to the remedy of constructive trust with respect to Gulf's claim In personam. We agree that Chase was unjustly enriched, for without the bunkers the vessels could not have sailed away to avoid a foreclosure in the United States that would have imperiled Chase's priority over suppliers. Chase knew that there had been default in payment of the loan and that the vessel was unable to pay for the bunkers, particularly since the freights had been assigned to Chase and paid to it directly. In the circumstances, for Chase to sit by without taking action to foreclose while accepting the bunkers it needed for the ship to leave for a port of foreclosure without any notice to Gulf was unjustified. By withholding its foreclosure, Chase lured Gulf into supplying the bunkers on credit when Chase knew that the vessels had no cash, for the freights went directly to Chase, and Chase itself had to pay the crew's wages. Chase also knew that when the bunkers were lifted, the vessel was to sail from these shores where the supplier has a lien for necessaries such as the oil for the voyages.
 
 
 26
 We find jurisdiction on the basis of diversity of citizenship, and hence we may consider doctrine under such jurisdiction even though the District Court assumed the jurisdiction in admiralty. See Troupe v. Chicago, D. & G. B. Transit Co., 234 F.2d 253, 258 (2d Cir. 1956); Beverly Hills Nat'l Bank & Trust Co. v. Compania de Navegacione Almirante, S.A., 437 F.2d 301, 306 (9th Cir.), Cert. denied, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971).
 
 
 27
 When justice requires it, quasi-contract will serve as the remedy for unjust enrichment. 1 Williston on Contracts § 3A (3d ed. 1957). See Bloomgarden v. Coyer, 156 U.S.App.D.C. 109, 479 F.2d 201, 210-11 (1973); Bradkin v. Leverton, 26 N.Y.2d 192, 196-97, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970). The remedy requires no finding of consent, for it can support a recovery quite opposed to the defendant's intention to pay. 1 Corbin on Contracts § 19 (2d ed. 1963). See generally Corbin, Quasi-Contractual Obligations, 21 Yale L.J. 533 (1912). When the retention of the benefit without payment is unjustified, See Restatement of Restitution § 1, comments b, c (1937), the remedy lies in quasi-contract, See id., introductory note at 4-9. When there is no Res to restore, money damages are awarded to prevent unjust enrichment. 1 Corbin on Contracts S 19; Restatement of Restitution § 4, comment e. Here, the prior course of dealing and the secret plan of Chase to remove the vessel at the expense of the creditor's right to enforce his lien is enough to invoke the remedy of recovery of money damages in quasi-contract. And, as we have seen, we need not go so far as to find that there was a promise to pay implied since the requirement of such a fiction has not survived the joinder of law and equity. See United States v. Neidorf, 522 F.2d 916, 919 (9th Cir. 1975), Cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976).
 
 
 28
 Since Chase is solvent, we need not consider whether the specific money obtained from the sale of the vessels or from the freights retained enough identity to serve as the Res of a constructive trust. Money damages are good enough. By treating the remedy as one for money damages, we avoid the question of whether, since the proceeds of sale were adjudicated by the Bahamian court to belong to Chase, there still remains a disposable Res For our adjudication. Having decided that the District Court did not need the remedy of constructive trust, we need not consider the status of the freights in the hands of Chase and whether they should be considered as collateral security, apart from the vessels, which never left the jurisdiction of the United States so as to become amenable to the jurisdiction of the Bahamian court.
 
 
 29
 We note that although we have sustained this part of the District Court's judgment on the basis of diversity jurisdiction, it is probable that we can reach the same result alternatively as being within the admiralty jurisdiction. The libel claimed that an express maritime contract existed between Gulf and Chase. Even though the District Judge found that no such express contract had come into being, it may be that the destruction of Gulf's lien interfered with its contract with the vessel owner so as to bring the obligation of Chase within the maritime jurisdiction. Since there is a maritime contract involved, we do not doubt that "rights based on quasi-contract are found in admiralty," See Archawski v. Hanioti, 350 U.S. 532, 535, 76 S.Ct. 617, 100 L.Ed. 676 (1956), and that this may be the very case left open in Archawski. Cf. Peninsular & Oriental S.S. Co. v. Overseas Oil Carriers, Inc., 553 F.2d 830, 835 (2d Cir.), Cert. denied, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977). In any event, Archawski teaches that the old restriction on equitable remedies in admiralty, See THE ECLIPSE, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890), is no longer quite so severe. Cf. Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 339 U.S. 684, 690-92, 70 S.Ct. 861, 94 L.Ed. 1206 (1950); Beverly Hills Nat'l Bank & Trust Co. v. Compania de Navegacione Almirante, S.A., supra, 437 F.2d at 305. In fact, even if the diversity jurisdiction were challenged, there would still be pendent jurisdiction over the claim in quasi-contract.
 
 II
 
 30
 We hold that Gulf may not recover the balance of the debt owed it for earlier bunkers, for we see no unjust enrichment with respect to them. As a matter of admiralty law, whatever inchoate maritime liens Gulf might have had, Maritime Lien Act, 46 U.S.C. § 971, such liens were effectively terminated by the Bahamian decree, for the court in the Bahamas had jurisdiction over the vessels in its own ports. Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The effect of such a sale in a proceeding In rem is to divest all liens against the ship in the hands of the purchaser. G. Gilmore & C. Black, The Law of Admiralty § 9-19 at 622 (2d ed. 1975). The maritime lien that was discharged included not only the ship and her appurtenances but also the proceeds of the sale and the freight, Id. at 622 n.80. See THE TRENTON, 4 F. 657, 664 (E.D.Mich.1880).
 
 
 31
 We hold that title to the proceeds of sale as substitution for the vessel is in the hands of the mortgagee free from any maritime liens, since the priority of liens was a matter for determination by the law of the forum the Bahamas. Payne v. SS TROPIC BREEZE, 423 F.2d 236, 239 & n.8 (1st Cir.), Cert. denied, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970) (citing cases); Brandon v. SS DENTON 302 F.2d 404, 410 (5th Cir. 1962) (preferred ship mortgage prevails over fuel supplied in Italy; law of forum governs). The foreign judgment is entitled to recognition.
 
 
 32
 Even short of the Bahamian decree, Gulf was guilty of laches which constitutes a statutory waiver of the maritime lien. 46 U.S.C. § 974.
 
 
 33
 Creole was in arrears to Gulf for years. Gulf allowed Creole's debit balance to exceed the credit allowance granted to Creole by Gulf. Gulf took no steps to arrest the vessel when she was in arrears. Moreover, all the oil furnished by Gulf After Chase created the cash collateral account was paid. There was no reliance on Chase. Gulf simply credited each current payment to the earliest amount owed. We see no equity in Gulf's position except for the oil furnished for the last voyage. The freights would generally belong to the mortgagee as a result of the foreclosure, for freights may be the subject of an In rem proceeding in admiralty, See United States v. Freights of THE MOUNT SHASTA, 274 U.S. 466, 470, 47 S.Ct. 666, 71 L.Ed. 1156 (1927); and "if a maritime lien attaches to a vessel it also attaches to its freights, which are incident to the 'vessel' ", See Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp., 306 F.2d 188, 192 (9th Cir. 1962) (interpreting "vessel" under Maritime Lien Act, 46 U.S.C. §§ 971-975), Cf. Gray v. Freights of THE KATE, 63 F. 707, 713 (S.D.N.Y.1894) (Brown, J.), unless they had already been paid over by the cargo, See Galban Lobo Trading Co. S/A v. THE DIPONEGARO, 103 F.Supp. 452, 454 (S.D.N.Y.1951); THE PERLA, 94 F.Supp. 111, 112-13 (E.D.Pa.1950). It may be argued, however, that, in this case, since the freights had been paid over to the mortgagee in the United States before the foreclosure, they had never come under the jurisdiction of the Bahamian Court, and that we are free to adjudicate with respect to the freights as a fund separate from the vessel. We pretermit this question for we find no equitable reason, as we have seen, for permitting Gulf to go against the freights even if we have jurisdiction over their disposition.
 
 
 34
 We direct that judgment be entered for $76,352.44 as of the date of the original judgment, with interest on that amount from the former date. F.R.App.Proc. 37. We reverse the balance of the judgment and direct the dismissal of the complaint after the entry of the appropriate judgment. No costs.ON PETITION FOR REHEARING
 
 
 35
 The petition for rehearing is granted. On rehearing we adhere to our original decision.
 
 
 36
 The petition for rehearing contends that Chase received a benefit from the earlier supply of bunkers before the last voyage and that, hence, in equity, Gulf is entitled to be paid because Chase caused the vessel to leave the United States with the attendant destruction of an inchoate lien of Gulf. This misapprehends our ruling. We did not say that Chase was precluded from foreclosing the mortgage on the vessel in the Bahamas, for it had the right to do so under international maritime law. If Chase had paid cash for the bunkers needed for the last voyage, Gulf would have had no equitable claim. The fact that there were inchoate liens by suppliers in the United States did not in itself prohibit the Bahamian foreclosure, and Gulf's inchoate maritime lien, like other maritime liens, was wiped out in the Bahamas.
 
 
 37
 Even if the freights earned on voyages before the last voyage did not pass to the mortgagee by virtue of the Bahamian foreclosure because they were paid in the United States, we see no equitable reason to impress a constructive trust upon them, since an inchoate lien against such freights could have been asserted earlier to determine whether payment directly to the mortgagee instead of to the shipowner equally caused the payment to lose its character as freight.
 
 
 38
 The petition also argues that we erred in finding Gulf guilty of laches. In our main opinion we mentioned laches, not as a strict time-bar, but as an additional reason for denying equitable relief.* See Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946). It would be inequitable to keep the claim alive (1) because Gulf did not rely on Chase, but on the credit of the vessel, when it supplied the bunkers; (2) because when Creole fell in arrears, Gulf chose to continue to supply the vessel on more liberal credit terms; and (3) because there was prejudice to Chase in that a strict adherence by Gulf to its credit terms with the vessel might have alerted Chase to earlier action in protection of its interest as mortgagee of the vessel.
 
 
 
 [1]
 Mr. Charles W. Keeler, the Chase Vice President in charge of the Creole accounts, testified that he was concerned that because the VIKING and the VETERAN were in United States ports the ships would be arrested by Creole's creditors and that these creditors' liens might have priority over the mortgages held by Chase
 
 
 [2]
 The freights received incident to the vessels' final voyages were $104,167.91 for the VIKING, and $77,811.18 for the VETERAN, a total of $181,979.09. Chase disbursed $128,089.02 for crew's wages in April and May for both vessels
 
 
 *
 Accordingly, the parties' dispute over the exact span of time in which Gulf allowed its credit to the vessels to mount is not sufficiently material to require resolution