The WEST OF ENGLAND SHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION (LUXEMBOURG), Plaintiff,

v.

PATRIARCH STEAMSHIP COMPANY and Newton Waltham Bank and Trust Company, Defendants.

The WEST OF ENGLAND SHIP OWNERS MUTUAL INSURANCE ASSOCIATION (LONDON) LIMITED, Plaintiff,

v.

PATRIARCH STEAMSHIP COMPANY and Newton Waltham Bank and Trust Company, Defendants.

Civ. A. Nos. 71–1019–G, 71–1020–G.

United States District Court,
D. Massachusetts.

June 17, 1980.

Leo F. Glynn, Boston, Mass., for plaintiff.

Thomas H. Walsh, Jr., Bertram Snyder, Bingham, Dana & Gould, Boston, Mass., for Newton Waltham Bank.

Poster, Wilinsky, Goldstein, Burkin & Wennett, Boston, Mass., for Patriarch Steamship Co.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

These cases call for a determination of the rights of various parties in a fund of $73,000 now held in escrow by defendant Newton-Waltham Bank & Trust Company. They were consolidated; and liability issues were separated from those pertaining to damages and tried without a jury. The underlying facts are undisputed.

In 1965 the Newton-Waltham Bank & Trust Company (hereinafter referred to as "Bank") obtained a first preferred ship's mortgage on the SS Patraic Sky, a Liberian flag vessel, as collateral for a $300,000 loan to the Patriarch Steamship Company ("Patriarch"), a Liberian corporation formed for the sole purpose of purchasing and operating the vessel. Plaintiffs, the West of England Ship Owners Mutual Protection and Indemnity Association (Luxembourg) in C.A. 71–1019 and the West of England Ship Owners Mutual Insurance Association (London) Limited in C.A. 71–1020 (called collectively, for purposes of these consolidated cases, "West of England"), provided protection and indemnity marine insurance to the SS Patraic Sky from 1965 until the vessel was sold by the owners sometime in April, 1971 for its scrap value of approximately $131,500. At that time there was approximately $220,000 due and owing to the Bank on the mortgage note. West of England claimed it was owed approximately $73,000 for calls and assessments, which are the general equivalent of insurance premiums, and filed a claim of lien. In order to sell the vessel at private sale free of liens and encumbrances, Patriarch, the Bank, and West of England signed an agreement dated April 6, 1971 providing that after payment of crew wages and a brokerage commission, $73,000 in proceeds from the vessel's sale would be deposited with the Bank and held in escrow; and the Bank recorded a discharge of its mortgage, acknowledging full satisfaction of the same, dated April 14, 1971. The parties further provided that suit would be brought in a court in Massachusetts to determine the amount of West of England's claim and the rights of the Bank and West of England to the funds in escrow

> "based on any priority or preference of claim in respect to their prior position as first preferred mortgagee and lien holder, respectively."

These actions were commenced on May 13, 1971.

In January 1972, Gulf Oil Trading Company ("Gulf") commenced a different action against Patriarch in this court for amounts due for fuel oil bunkers furnished to the SS Patraic Sky in December 1970 and January, February and March of 1971, on its last voyage before sale. At the outset of that litigation Gulf attempted to attach approximately $36,000 of the funds being held in

escrow by the Bank, under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. The Bank answered the writ of attachment by denying that it held any goods, effects or credits of Patriarch, which then appeared and admitted its debt to Gulf. Judgment on the underlying debt was entered on June 6, 1972 in C.A. No. 72–154–C, but Gulf's motion to have the funds that it had purportedly attached paid into the Registry of the Court in satisfaction of the judgment was denied because of the pendency of these cases. Gulf has intervened here, seeking to enforce its attachment and judgment.

In this action we are thus presented with claims to the $73,000 now held in escrow, asserted by the vessel's mortgagee, its insurers, and by the supplier of fuel, Gulf Oil, the intervening plaintiff. For the reasons stated herein, we hold that Gulf has no rights to the escrowed funds by virtue of its attachment and judgment in the prior proceeding, and that the Bank's mortgage is a valid preferred ship mortgage entitled to priority, in accordance with the provisions of the Ship Mortgage Act, over the nonmaritime claim of the insurer for unpaid insurance premiums.

### Gulf Oil Trading Company's Claim

We first examine the nature of Gulf's claim. In its complaint in intervention and supporting memorandum and affidavit, Gulf asserted that it sought to enforce a maritime lien, superior to that of the mortgagee bank, upon the proceeds of the vessel's sale, as well as to enforce its in personam judgment through the attachment of what it claimed to be Patriarch's funds, now in escrow. However, at trial and in its post-trial memorandum, Gulf abandoned the theory that it was a lienholder, accepting the Bank's position that a maritime lien may be executed only by an admiralty court in an in rem proceeding against the vessel or the proceeds after a judicial sale of the vessel, and that the lien is extinguished upon the loss or destruction of the vessel. In effect, Gulf moved too late to preserve any right it may have been able to assert in

the res. The sale of the vessel for scrap destroyed the res, and with it the opportunity to proceed in rem to recover a debt owing. After the sale, Gulf's only avenue of recovery was through an action in personam against the Patriarch Steamship Company. It commenced just such an action, as noted ante, and secured a judgment in its favor. The theory it now advances as intervenor in this action is that the funds held in escrow under the agreement between the Bank and West of England are funds actually belonging to Patriarch, and that they may therefore be reached by Gulf through the attachment and judgment it obtained in its in personam action against Patriarch before Chief Judge Caffrey.

■ We disagree with Gulf's analysis. In our opinion the funds being held in escrow are not funds belonging to Patriarch. Patriarch makes no claim to them. By the time Gulf sought attachment in C.A. No. 72–154–C the funds had already been distributed to West of England and the Bank, in exchange for a release of the bank's mortgage and the insurer's claim of lien. While title to the proceeds of the sale, as between the bank and the insurer, has yet to be resolved, it is clear that title no longer lies with the Patriarch Steamship Company. It abandoned any interest it may have had in the proceeds of the sale of its vessel when it agreed to turn the proceeds over to the bank in consideration of a release from the mortgage.

This view of the funds is certainly the one contemplated by the terms of the escrow agreement. The Bank debited Patriarch's account in the amount of $131,500 reflecting separate treasurer's checks totaling $53,568.75 to the Bank, $4,931.25 to the broker, and $73,000 listed to "Newton-Waltham Bank & Trust Company under Escrow Agreement with West of England Steamship Owners Protection and Indemnity Association Ltd." Finally, we note that under paragraph 27 of the Mortgage Agreement between the Bank and Patriarch any proceeds from the sale of the mortgaged vessel were to be so applied (after administrative expenses) first to the payment of the mort-

gage note and only then, to the extent of any surplus, to the shipowner, mortgagor.

Accordingly, we hold that Patriarch Steamship Co. has no right, title or interest in the $73,000 in proceeds of the sale of the Patraic Sky. Therefore, the proceeds now held in escrow pending resolution of the claims of the Bank and of West of England cannot be attached under Rule B or in satisfaction of Gulf's judgment against Patriarch Steamship Company.

■ The court has considered, but here rejects, an alternative theory supporting recovery by Gulf on the vessel's unpaid debt. In the recent case of *Gulf Oil Trading Co. v. Creole Supply*, 2 Cir. 1979, 596 F.2d 515, Gulf Oil had supplied fuel oil to a vessel on which the Chase Manhattan Bank (Chase) held a preferred ship mortgage. Had the mortgage been foreclosed in the United States, Gulf's lien for the supply of fuel bunkers would have prevailed over the ship mortgage because it was a mortgage secured by a foreign vessel. 46 U.S.C. § 951. Chase, however, permitted the ship to leave the United States and to be foreclosed in the Bahamas where, under Bahamian law, the foreign mortgage was given higher priority.

After the sale in the Bahamas, Gulf sued Chase (rather than the vessel, *in rem*) in United States District Court on a theory of unjust enrichment, requesting the equitable remedy of damages in quasi-contract. The court found that Chase had benefited from the bunkers supplied by Gulf and that without the bunkers, Chase would not have been able to arrange for the ship to be sailed to the Bahamas where it could be foreclosed to Chase's best advantage. The Court of Appeals affirmed judgment for Gulf and, as to the bunkers supplied on the last voyage from the United States port to the Bahamas, sustained an award of money damages in quasi-contract. But as to the fuel bunkers supplied prior to the last voyage, the Court of Appeals found no unjust enrich-

ment. Any inchoate maritime lien represented by these earlier supplies to the vessel were wiped out when the Bahamian court entered its foreclosure decree. 596 F.2d at 521.

The facts in the *Creole Supply* case resemble certain of the facts presented in the instant case. In both cases Gulf Oil acted too late to assert rights *in rem* that would have fully protected its claim had the vessel not been, in the one case, sold for scrap, and in the other, foreclosed in a jurisdiction whose laws were less favorable to Gulf's lien position. Moreover, at issue in both cases are fuel deliveries made both prior to and for the purposes of the last voyage leading to the sale that defeated the lien position.[1]

However, any similarity between the two cases ends there. In support of its decision to order an equitable remedy in the supplier's favor, the court in *Creole Supply* relied on what it found to be a "prior course of dealing and [a] secret plan of Chase to remove the vessel at the expense of the creditor's right to enforce his lien." 596 F.2d at 520. While in this case, the manner in which the Patraic Sky was sold and the proceeds distributed did work to exclude potential lien creditors, there is neither evidence of nor allegation that the Bank or West of England planned to defraud pre-sale lienors. The decision to sell the Patraic Sky was made in March of 1971. It can be concluded that at the time fuel was delivered in January, February or March 1971, neither the Bank nor the vessel's owner knew that the ship was embarking on its last voyage or that at the end of the voyage it would be sold for scrap thereby destroying the only *res* against which Gulf could enforce a lien for the fuel it had just delivered.

Not having come forward with evidence of a plan by the Bank or West of England to defraud pre-sale lienors, Gulf is here left in the same position with respect to the

---

1. We note, of course, that had the Patraic Sky been properly foreclosed in admiralty, the Bank's preferred mortgage would have been subordinated only to liens for fuel supplied in the United States. 46 U.S.C. § 951. Of the two deliveries, totalling $8,250, made in the United States, only the January 6, 1971 delivery was made in connection with the last voyage.

bunkers it supplied the Patraic Sky as it was with respect to the bunkers supplied the vessel in *Creole Supply* prior to that vessel's last voyage. The effect of the sale in either case was to cut off recovery through a proceeding *in rem*; yet, under the facts presented in each case, there was nothing to justify recovery in quasi-contract through a proceeding *in personam*. Our jurisdiction in admiralty to grant the equitable remedy sought by plaintiffs is not open to question. *Archawski v. Hanioti*, 1956, 350 U.S. 532, 535–536, 76 S.Ct. 617, 620–621, 100 L.Ed. 676. However, the circumstances of this case do not in our opinion support a finding of unjust enrichment or recovery for Gulf of money damages in quasi-contract.

### West of England and Newton-Waltham's Claims

■ The Bank and West of England have agreed that their rights in the escrow funds should be determined by whatever priority they would have had as, respectively, preferred mortgagee and lienholder, before the sale for scrap. Under the Ship Mortgage Act, 46 U.S.C. §§ 951, 953, a preferred mortgage is subordinate to liens arising prior to the recording of the mortgage, and to any claim for tort, wage, salvage and court costs. The preferred mortgage enjoys priority over all other claims, unless the mortgage is on a foreign vessel; in that case it is subordinate to maritime liens for repairs, supplies and other necessaries supplied in the United States. The list of maritime liens to which the foreign ship mortgage is subordinated in § 953 is taken from 46 U.S.C. § 971 which defines liens under the Lien Act. Accordingly, case law under the Lien Act determines what claims will have priority under the Ship Mortgage Act. Gilmore & Black (2d ed., 1975), *The Law of Admiralty*, § 9–70. The case law is clear that claims of an insurer for unpaid insurance premiums do not give rise to a maritime lien. *The Prilla*, D.Mass. 1937, 21 F.Supp. 383; *The Hall*, D.Mass. 1931, 48 F.2d 646; *The Minnie V.*, D.Mass. 1927, 24 F.2d 604. Therefore, unless plaintiff shows that the Bank's mortgage is in-

valid or that there are equitable grounds for denying the mortgagee the priority to which it is entitled by statute, we must find that the Bank has first priority over rights to the escrowed funds.

West of England has argued: (a) that the mortgage was invalid because it was not within the statutory power of the Bank to accept, (b) that the mortgage was a sham because the Bank looked to the endorsers rather than to the vessel for security, (c) that by failing to foreclose when its mortgage was in default and by continuing to make unsecured loans to enable the vessel to operate, the Bank turned the ship into a "floating credit card" and worked a fraud on creditors, and (d) that the bank received the benefits of the insurance provided by West of England and therefore should be required to share the cost to avoid unjust enrichment. We find that the evidence does not support any of these grounds.

### (a) Ultra Vires

■ Regarding the Bank's powers to accept mortgages on foreign vessels, the provisions of Mass. G.L. c. 172 are controlling. Mass. G.L. c. 172, § 48(3) gives the banking department of a trust company the power

> to discount, buy, invest in, hold, assign, transfer, sell and negotiate promissory notes, drafts, bills of exchange, mortgages . . . bonds or notes secured by mortgages . . . and other evidences of debt for its own account or for the account of customers.

Section 48(4) allows the bank "to advance money or credits on real estate or on personal security, on terms to be agreed upon." No limitation to domestic property is included here. Paragraphs (6), (9) and (18) of section 48 specifically permit certain types of foreign investments. The restrictions and conditions on mortgage loans on real estate are comprehensive. c. 172, §§ 55–57. But nowhere does there appear a prohibition of mortgage loans on foreign vessels or a restriction to domestic ship mortgages. Bank examiners in yearly state and federal examinations of the Bank's transactions never cited the Bank for making an unau-

thorized loan. In the absence of an explicit restriction by statute applicable to this mortgage loan, we find that the Bank did not act *ultra vires* in accepting a mortgage on the SS Patraic Sky.[2]

### (b) Sham Mortgage

As evidence of the sham nature of this mortgage, West of England argues that the Bank made no appraisal or survey of the vessel, that it extended a loan amounting to 90% of the value of the vessel when the usual practice was to loan 80% of the value of security, and that it looked only to the endorsements of the five co-signers on the note, rather than to the vessel, for security on the loan. West of England also points to the Bank's extension of unsecured loans to Patriarch and to its failure to foreclose after default as further evidence that the vessel was not perceived as security. Parenthetically, the only case cited by West of England, *Flood v. Trawler Francis L. Mac-Pherson*, D.Mass.1966, 258 F.Supp. 768, provides no support for this theory. In *Flood* a transaction was set up that had the appearance of a mortgage, but where no money was ever extended—a true sham.

As a policy matter this court should not penalize a bank mortgagee for having taken the added precaution of obtaining additional security, in the form of personal endorsements, on a note secured by collateral such as this. Moreover, the modern trend in regard to the common maritime lien is to presume that the lienor relied on his lien; by taking additional security or looking first to the owner rather than the vessel, the lienor does not automatically waive the lien. *See* Gilmore & Black, *supra* § 9–38; *Layton Industries v. Sport Fishing Cruiser Gladiator*, D.C.Mass.1967, 263 F.Supp. 356, 359. In fact the record on this loan suggests that the Bank had designed a not unreasonable security package. The amount of the indebtedness was reduced from $300,000 to $220,000, some unsecured loans were retired, the ship itself returned $131,000 when sold for scrap, and new notes

have been negotiated with the endorsers to cover the deficiency. On the basis of the evidence before us we therefore find the Bank executed and recorded a valid ship mortgage.

### (c) Unclean Hands

Plaintiffs next argue that even if the Bank's mortgage were valid, the Bank should, by its conduct, be barred from asserting its statutory priority, on a theory of equitable subordination of the mortgage, viz., that where the mortgagee knows of the vessel's insolvency but encourages or continues to permit the accumulation of post-mortgage liens for services, it should not be allowed to profit from its absolute priority as preferred ship mortgagee.

Plaintiffs point to the fact that the Bank did not foreclose on the vessel during the five years the mortgage was in default even though the Bank knew that the vessel was operating at a loss. Instead the Bank made additional unsecured loans to Patriarch which, West of England claims, enabled the vessel Patraic Sky to continue operating and induced creditors, such as West of England, to supply additional services or insurance coverage in reliance on the Bank's continued funding. Moreover, plaintiffs argue, the Bank then took advantage of its priority position by applying payments on the loans to the unsecured debt first instead of to the pre-existing mortgage debt, because it knew its mortgage would be the first debt satisfied out of whatever proceeds remained after the vessel was sold.

The mere failure of the Bank to foreclose on a ship mortgage in default does not deprive the mortgagee of its preferred status. In *The Favorite*, 2 Cir. 1941, 120 F.2d 899, the mortgage was not paid at maturity in 1930 and remained in default until 1939. Liens for supplies accrued in 1938, yet, after foreclosure, the court upheld the priority of the mortgage over the post-mortgage liens, holding that 46 U.S.C.

---

**2.** Although we do not now feel that this issue presents a close question of the application of state law, we note that at no time in the course of this action did any party propose certification of the issue to the Supreme Judicial Court pursuant to Rule 3:21 of that court.

§ 951 does not require the mortgagee to foreclose at maturity or any other particular time in order to preserve the preferred status of a ship mortgage, 120 F.2d at 902.

■ Regarding the Bank's knowledge of the vessel's financial condition, while the profit and loss statements do show net losses for most of the years the vessel was operating, revenues (including insurance recoveries) were sufficient to show a gross profit after payment of the costs of operating the vessel, including costs of insurance and fuel. *See* defendants' Ex. B–1 through B–6. Only when the costs of administration and depreciation are deducted, does a net loss appear for these years. Under the circumstances the Bank's forebearance cannot be viewed as an affirmative attempt to mislead creditors. In fact, the burden of inquiry rests generally with the suppliers who dealt with the vessel. *Libel of Pilgrim Trust Co. v. The Francis C. Denehy*, D.Maine 1950, 94 F.Supp. 807, 815. West of England, for example, knew of the mortgage and could have readily discovered whether the maturity date had passed. It had the right at any time to demand from the ship's owner a guarantee to pay all contributions due. Rules of the West of England, London, Class I, Rule 24(c). Although the Bank was under a duty not to make false or misleading representations, in our view it was not obliged to volunteer disclosure of its plan or the condition of its loan to subsequent lienors. *See, National Shawmut Bank of Boston v. The Winthrop*, D.Mass.1955, 129 F.Supp. 661, 662.

The unsecured loans made by the Bank, which, according to testimony, were all repaid, were in most instances advances to pay wages and other expenses when revenues from charters were not yet available. Prepayment of unsecured loans before secured loans is a matter of standard banking practice. While in a broad sense these loans, like any extension of credit, enabled Patriarch to continue operating, this is not a case where the Bank financed or approved voyages knowing it was endangering the rights of prior creditors by allowing new liens to arise. *Cf. Northwest Marine*

*Works v. United States*, 9 Cir. 1962, 307 F.2d 537.

*State of Israel v. M/V Nili*, 5 Cir. 1970, 435 F.2d 242, *cert. denied*, 1971, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532, is not controlling on the facts here presented. In that case, plaintiff Israel held a preferred ship mortgage which it had obtained to secure several promissory notes on a construction loan. When Israel attempted to foreclose after maturity it discovered the owners were entirely without funds. Negotiations began on the subject of selling the vessel, but no sale was consummated. Thereafter, a new charter was undertaken and during that voyage numerous liens for services were incurred. Because the mortgage secured a foreign vessel these liens would normally enjoy priority over the mortgage at a foreclosure sale. In its suit on foreclosure, Israel attempted to circumvent the statutory priority of the services liens by invoking a lien preclusionary clause contained in the recorded mortgage. On appeal, the Court of Appeals affirmed the district court order subordinating the mortgage priority and held that lien preclusionary clauses were invalid in the face of the clear intent of Congress, expressed in 46 U.S.C. § 951, to protect the liens of American shipyards and suppliers. 435 F.2d at 248. Only as an additional ground for its ruling did the Court of Appeals suggest that the mortgagee came into court with "unclean hands."

The *Nili* opinion, therefore, offers no further authority for ordering the equitable subordination of the mortgage. In *Nili* the mortgage was ordered subordinated according to the strict terms of the statute; a statute held by the court to be so absolute in its terms that a lien preclusionary clause could not alter the outcome. The fact that the last charter was undertaken long after the default and insolvency had become clear was just one "circumstance [that] has its place in the balancing of equities." 435 F.2d at 249. Even if we were to adopt that aspect of that case as the sole and dispositive ground for its holding, the circumstances there presented portrayed a far more

reckless indifference to the fate of post-mortgage lienors than is presented on the facts in the case at bar.

#### (d) Unjust Enrichment

As its last attempt to elevate its claim over the Bank's mortgage, plaintiff proposes that the mortgagee has been unjustly enriched by West of England's continued insurance coverage. This theory is premised on the rule that in all lien contests, tort and salvage claims take priority over a preferred mortgage. 46 U.S.C. § 953(a)(2). Because the mortgagee bank was loss payee on the vessel's insurance policy, the insurance coverage inured to the benefit of the Bank. Thus, reasons the plaintiff, the insurance coverage it extended enriched the Bank by protecting it from possible tort claims superior to its mortgage. As a beneficiary, the Bank ought therefore to contribute to the cost of the unpaid premiums.

We find this theory, which transforms unpaid insurance premiums to the highest priority of maritime liens, far too conjectural and contrary to long established case law denying lien status to insurance premiums. The benefit to mortgagee was at best incidental and, under the circumstances, we think this not a proper occasion for applying the equitable principles of unjust enrichment.[3]  See Seaboard Shipping Corp. v. Jocharanne Tugboat Corp., 2 Cir. 1972, 461 F.2d 500.

#### Conclusion

Accordingly we grant judgment for the defendants on the claim of intervening plaintiff, Gulf Oil Trading Co. In respect of the consolidated causes of action, instituted in accordance with the agreement dated April 6, 1971 between the plaintiffs, West of England (Luxembourg) and (London) and the defendant Bank, judgment shall enter for the defendant.

[3.] We note further that under the terms of the agreement between West of England and the Bank on April 6, 1971, by which they agreed to release their claims and determine their rights in the proceeds of sale, the parties stipulated such rights would be determined "based on any priority or preference of claim in respect to their prior position as first preferred mortgagee and lien holder, respectively." That part of the agreement could be read more strictly than we have read it, to rule out West of England's alternative theories for recovery to the extent they raise issues, such as equitable contribution, not based strictly upon traditional notions of lien status and lien priority.