**NORTHWEST MARINE WORKS et al.,
Appellants,**

v.

**UNITED STATES of America,
Appellee.**

**No. 17199.**

United States Court of Appeals
Ninth Circuit.

Aug. 17, 1962.

Dorr, Cooper & Hays, and John Hays and Georege L. Waddell, San Francisco, Cal., for appellants Northwest Marine Iron Works and Bethlehem Steel Co.

Hall, Henry, Oliver & McReavy, and Stephen McReavy, San Francisco, Cal., for appellants Pacific Gamble Robinson Co., D. R. Girdwood, Grays Harbor-Willapa Harbor Pilots Ass'n and North Pacific Shipping Co., Ltd.

Cecil F. Poole, U. S. Atty., Keith R. Ferguson, Sp. Asst. to the Atty. Gen., John F. Meadows, Atty., Admiralty & Shipping Section, Dept. of Justice, San Francisco, Cal., for appellee.

Before POPE, KOELSCH and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

In this case, the United States, by means of stipulations to which appellants were not parties, has kept a ship operating for a long time and at a considerable loss, purportedly under the authority of orders of the court in an action to foreclose a ship mortgage. The result, if the judgment below is permitted to stand, is to freeze out appellants, who held valid maritime liens upon the vessel when the foreclosure libel was filed. It may have been in the public interest to keep the ship operating. Congress has provided a means of doing so, under which the rights of appellants would be protected. But the government chose a different means and now claims rights that it would not have, had it followed the procedure established by Congress. We think the government is not entitled to the rights it claims, and are therefore reversing.

The Audrey II was sold by the United States to Universal Oil Carriers (Universal) in 1951. As part of the purchase price, the government received a promissory note and a preferred ship mortgage. During 1953 and 1954, appellants obtained maritime liens upon the ship, the validity and amount of which are not contested. On May 14, 1954, pursuant to acceleration provisions in the note and mortgage, the government notified Universal that the entire unpaid principal ($354,510) and interest were due.

Libel to foreclose was filed August 27, 1954, while the ship was in Los Angeles harbor, carrying a cargo of coal destined for Japan. At that time, she had been chartered to the Navy, Military Sea Transport Service, for two successive periods of 120 days following completion of the voyage to Japan, to be used in carriage of cargo between Japan and Korea. Apparently, the government was anxious that the vessel proceed to Japan and carry out the charter, although this can only be inferred from what happened next. Five days later, on September 1, the government and Universal filed a stipulation, and the court made a "Consent Order For The Operation of the * * * Ship in the Custody of the Court". The libel did not ask for such an order, or that the costs of operation be declared liens upon the ship. It was in the usual form, asking merely that the vessel be sold, that the government be permitted to be a purchaser, and that disbursements for care and preservation of the ship be made a lien.

Notice was not published until September 2, pursuant to Admiralty Rule 10 (28 U.S.C.A.) and Rule 123, Rules of the District Court, Southern District of California, West's Ann.Code. The notice made no mention of the stipulation, of the consent order, or of any proposed operation of the ship, although Rule 18(a) of the Rules of the District Court would seem to require notice to all known creditors when a receiver is to be appointed. Default of persons not appearing was entered on September 20. None of appellants had appeared.

The stipulation and consent order made the master and first mate of the ship Deputy United States Marshals and designated one Higgins a United States Marshal and "shoreside custodian". Universal was to "undertake to continue

its operation of the vessel" subject to the continuing jurisdiction of the court. Charter hire and earnings were to be assigned and paid to the shoreside custodian, who was to keep the money in a special bank account, to be in the custody of the court. Only the shoreside custodian could make withdrawals and withdrawals had to be with the following priority: (1) Current operating expenses, (2) Amortization and interest on the outstanding mortgage indebtedness of the vessel, and (3) General overhead expense of Universal. Universal was immediately to advance $17,000 to pay for crew's wages and past charges already incurred, the advances to be repaid by the shoreside custodian out of the next available funds received by him from freights. The shoreside custodian was to make monthly reports as to the business being carried on by the Audrey II, including operational revenues and expenses, and as to withdrawals from the special account, to the United States. Universal was to give reasonable notice to the United States of any proposed repairs, and was to be liable for all claims arising from the management of the vessel. The United States had the right to inspect the vessel and its books at any time; could terminate the agreement at any time; had to give its consent before Universal could enter into any period charter, except if with an agency of the government; was not to terminate the arrangement during the period of any charter with a private company; and was not to terminate it during the period of any charter with a government agency without the prior approval of the agency. Universal could terminate the agreement, the termination not to be effective "until return of the vessel to a United States port within the jurisdiction of the District Court in this proceeding".

The consent order recites that the stipulation was "entered into by and between the parties with the concurrence, agreement, and approval of the Attorney General of the United States and various agencies of the United States Government interested therein and the claimant herein". It also states that it was represented to the court, and the court found, that "it is in the public interest that, subject to the terms of said Stipulation, the parties hereto effect the continued operation of the vessel without prejudice to the claims and rights of either party or to the Court's jurisdiction and custody of the vessel and of the proceeding, pending final determination of the above cause". The court also found that "all of the terms and provisions of said Stipulation are fair and just to all of the parties concerned herein". The appealing parties were "concerned" but were not parties to the stipulation or order.

The ship proceeded to Japan. Universal failed to advance any of the $17,000 (later amended to $19,500) for payment of crew's wages and port charges already incurred. On November 18, 1954, the District Court made an ex parte determination that "immediate action [was] necessary to maintain [the] vessel and save [the] vessel from deterioration and damage". It accepted an offer of the United States, through its agency, the Maritime Administration,[1] to advance monies to be used exclusively for "wages of the crew, allotments to their families, bunker, and operating expenses". T. J. Stevenson & Co. was appointed as Shoreside Custodian's Agent to operate and maintain the vessel in place of Universal. The order recites that the advance, up to $150,000, ($142,860.08 was actually advanced) should be a lien on the vessel "for its maintenance and operation and be repayable out of revenues received from the operation of [the] vessel and/or in the event of sale from the proceeds of such sale". The order so provides, except that it omits reference to payment from proceeds of sale. It does not purport to establish priorities

1. This agency and the Secretary of Commerce are now responsible for policy formation, and ship operation and procurement, as opposed to regulatory and quasi-judicial functions, which are handled by the Maritime Board. (See Gilmore & Black, Law of Admiralty, 758–59, (1957)).

as between the government and appellants.

In June, 1955, the Audrey II returned to the United States (San Francisco), and terminated her time charter. The cause was transferred to the district court for the Northern District of California, which purported to confirm the orders of the Southern District. Foreclosure was ordered, and the ship was sold for $430,000, of which $345,510, representing the principal of the mortgage, was paid off by the purchaser's giving the government a new note and mortgage. A net sum of $87,731.72 was deposited in court, and is now in its registry. The government's advances for the voyage under the order of November, 1954, amounted to $142,860.08. The total of the intervening libellants' claims was $60,980.15. The court below held that the government's advances take priority over the maritime liens of the intervening libellants.

The vessel was thus operated from September 1, 1954 to June 1955, in distant parts of the world, and at large losses, purportedly under authority of the court in a foreclosure action, the normal purpose of which is to enable the mortgage holder to have the ship sold in order to collect the debt. In such a case, it is to be expected that expenses will be incurred in preserving the vessel until it is sold, and in selling it. But we cannot conceive that holders of maritime liens would expect that the court, with or without the consent of the owner or the mortgagee, would do or permit what was done here.

We do not hold that the consent orders were void; that question need not be decided here. We do not decide whether, or under what circumstances, third parties furnishing services or supplies to the vessel could have obtained liens thereon, nor whether the advances made by the government would, in other circumstances, entitle the government to a preferred lien for their repayment. (See International Refugees Org. v. Maryland Drydock Co., 4 Cir., 1950, 179 F.2d 284, 289–290; The Willamette Val-

ley, 9 Cir., 1895, 66 F. 565) We do hold that when the government, as mortgagee, elected, instead of foreclosing, to continue the operation of the vessel, for its own purposes and benefit, it did so at its own risk, and not at that of appellant lien holders. It would be grossly unfair to permit the government, by proceedings that were essentially ex parte as to these appellants, to put the ship on the high seas upon whatever terms it might choose, as a sort of floating credit card payable to bearer, presumably able to incure maritime liens which would ordinarily, because later in time, prevail over those of appellants (The St. Jago de Cuba, 9 Wheat. 409, 416, 22 U.S. 409, 416, 6 L.Ed. 122), and then, by advancing moneys to pay those who would otherwise have such liens, gain priority over appellants. (See the comments of Judge Brown in The Young America, D.C.N.Y. S.D.1887, 30 F. 789).

The government's principal reliance is upon Ex parte Whitney Steamboat Corporation, 1918, 249 U.S. 115, 39 S.Ct. 5, 63 L.Ed. 507. It is not remotely in point. It holds only that the government, acting under World War I emergency legislation, could requisition a ship when in custodia legis in an action in rem brought by a private party. It passes upon no issue here decided. The government also says that similar orders have been made, and vessels operated under them "all over the world", in 39 cases in various District Courts. It is an old saw that two wrongs do not make a right. Neither do thirty-nine.

The government says that what the court did, in substance, was to appoint a receiver, which is specifically authorized by statute. 46 U.S.C.A. § 952 provides:

"In any suit in rem in admiralty for the enforcement of the preferred mortgage lien, the court may appoint a receiver and, in its discretion, authorize the receiver to operate the mortgaged vessel. The marshal may be authorized and directed by the court to take possession of the mortgaged vessel notwithstanding the

fact that the vessel is in the possession or under the control of any person claiming a possessory common-law lien."

This section was enacted in 1920 (41 Stat. 1004), a part of the Ship Mortgage Act which, in turn, is a portion of the Merchant Marine Act, 1920. It does not expressly provide that all expenses of operating the vessel, regardless of circumstances, shall be prior to existing maritime liens. It should be read against the background of the normal rule as to receivers, that a court may not ordinarily authorize its receiver to carry on a debtor's business in a speculative way, not consistent with preservation of the estate. Attempts, under such circumstances, to give receiver's certificates priority over non-consenting lien creditors, are void. (International Trust Co. v. Decker Bros., 9 Cir., 1907, 152 F. 78; Hanna v. State Trust Co., 8 Cir., 1895, 70 F. 2; Nicholson v. Western Loan & Building Co., 9 Cir., 1932, 60 F.2d 516; Coursey v. International Harvester Co., 10 Cir., 1940, 109 F.2d 774; Smith v. Shenandoah Valley National Bank, 4 Cir., 1917, 246 F. 379).

■ Since 1938, the Ship Mortgage Act must also be construed as being modified by Chapter XIV of the Bankruptcy Act, 11 U.S.C.A. §§ 1101–1103, dealing with Maritime Commission Liens.[2] Some consideration of the background of this legislation seems necessary.

What happened here is all too reminiscent of what used to happen in the former and unlamented federal equity receiverships of railroads. (See: Thacker, "Some Tendencies of Modern Receiverships", 4 Cal.L.R. 32 (1915); Lowenthal, "The Railroad Reorganization Act", 47 Harv.L.R. 18 (1933)). In those cases, receivers, appointed under similar consent orders, were permitted to operate the roads and to issue certificates having priority over prior, non-consenting, lien holders. This was justified upon the ground that there was a public interest in keeping the roads operating. It was the abuses that occurred that were, at least in part, responsible for the enactment of § 77 of the Bankruptcy Act (11 U.S.C.A. § 205 as added by 47 Stat. 1474) in 1933.

In 1938 the Chandler Act was adopted (52 Stat. 840). Section 77, relating to railroads, was retained, and Chapter X, Corporate Reorganizations, replaced former § 77B. Both § 77, sub. c(3) and § 116 (11 U.S.C.A. § 516) permit the issuance of receiver's certificates, but in each there are protective provisions, including the authority, in the case of railroads, of the Interstate Commerce Commission, and in Chapter X cases, of the Securities and Exchange Commission. (As to the latter, see Section 208, 11 U.S.C.A. § 608, and Section 265, sub. a, 11 U.S.C.A. § 665, sub. a). Chapter XI, dealing with arrangements, was also enacted, and it protects secured creditors against continued operation of the business. Thus, in the Chandler Act, the Congress used the bankruptcy power to give greater effect to receiver's certificates, but under controlled conditions, in Chapter X, and limited the effect of such certificates, in § 77. It refused to depart from the normal rule in Chapter XI. See, also, Chapter XII and particularly, Section 461(11) (11 U.S.C.A. § 861(11)), and Section 446 (11 U.S.C.A. § 846).

Chapter XIV is part of the Chandler Act, and was adopted when Congress was well aware of the evils of consent receiverships under which railroads were operated under ex parte orders for long periods, often at the expense of prior

---

**2.** In 1950 the Maritime Commission was abolished, and its functions were transferred to a Maritime Board and to a Maritime Administration in the Department of Commerce. 1950 Reorg.Plan No. 21, 15 F.R. 3178, 64 Stat. 1273, (Eff. May 24, 1950;) see note under 46 U.S.C.A.

§ 1111. The functions involved in Chapter XIV have been transferred to the Maritime Administration, the Maritime Board being responsible for regulation, control of rates, and subsidy awards. (See 1950 Reorg.Plan, supra).

secured creditors. The pertinent portions of the Chapter are § 701 (11 U.S. C.A. § 1101):

"Notwithstanding any provision of law, in any proceeding in a bankruptcy, equity, or admiralty court of the United States in which a receiver or trustee may be appointed for any corporation engaged in the operation of one or more vessels of United States registry between the United States and any foreign country, upon which the United States holds mortgages, the court upon finding that it will inure to the advantage of the estate and the parties in interest and that it will tend to further the purposes of [the Merchant Marine Act, 1936], may constitute and appoint the United States Maritime Commission[2] as sole trustee or receiver, subject to the directions and orders of the court, and in any such proceeding the appointment of any person other than the Commission as trustee or receiver shall become effective upon the ratification thereof by the Commission without a hearing, unless the Commission shall deem a hearing necessary. In no such proceeding shall the Commission be constituted as trustee or receiver without its express consent."

Also, Section 702 (11 U.S.C.A. § 1102):

"If the court, in any such proceeding, is unwilling to permit the trustee or receiver to operate such vessels in such service pending the termination of such proceeding, without financial aid from the Government, and the Commission certifies to the court that the continued operation of such vessels is, in the opinion of the Commission, essential to the foreign commerce of the United States and is reasonably calculated to carry out the purposes and policy of [the Merchant Marine Act, 1936, as amended], the court may permit the Commission to operate the vessels subject to the orders of the court and upon terms decreed by the court sufficient to protect all the parties in interest, for the account of the trustee or receiver, directly or through a managing agent or operator employed by the Commission, if the Commission undertakes to pay all operating losses resulting from such operation, and comply with the terms imposed by the court, and such vessel shall be considered to be a vessel of the United States within the meaning of [the Suits in Admiralty Act]. The Commission shall have no claim against the corporation, its estate, or its assets for the amount of such payments, but the Commission may pay such sums for depreciation as it deems reasonable and such other sums as the court may deem just. The payment of such sums, and compliance with other terms duly imposed by the court, together with the payment of the operating losses, shall be in satisfaction of all claims against the Commission on account of the operation of such vessels".

The purposes of the Merchant Marine Act, which these sections are expressly designed to further, are stated as follows (46 U.S.C.A. § 1101):

"It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service on all routes essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the Unit-

2. See note 2 on page 542.

ed States, insofar as may be practicable, and (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine".

According to the chairman of the Commerce Committee, Senator Copeland, the purpose of Chapter XIV was:

"By reason of financial calamity which faces certain lines, and in order to make sure that such lines may be operated so that goodwill established by old-time lines may not be dissipated, it is thought that there should be inserted in the pending bill an amendment of this kind which would give a reasonable guaranty that the ships would be so operated, and at the same time * * * the rights of the 'estate and the parties in interest' would be preserved. The court would take into consideration any action it might determine to be wise, with respect to the other interests".

(Cong.Rec., 75th Cong., 3d Sess., June 10, 1938 at 8694).

■ The government asserts that the proceedings below were not taken under Chapter XIV. We agree. It also asserts that they could not have been, there being no proceeding under the bankruptcy act by or against Universal. We do not agree. The chapter, in Section 701, is expressly made applicable "in any proceeding in a[n] * * * admiralty court * * * in which a receiver * * * may be appointed * * *." The proceeding below is of such a character. True, it is not one in which a receiver "for any corporation" may be appointed. But we do not read the law so literally. We think that it means receiver for the *assets* of any corporation. Any other reading would defeat the purpose, namely to keep the ship operating in the pub-

lic interest. That purpose applies as much to a mortgage foreclosure against one ship of a line as it does to a bankruptcy proceeding against the owner of a fleet.

■ The Congress, in enacting Chapter XIV, gave the courts authority to keep the ship operating at the instance of the government, together with the power to require the government to pay the losses of the operation. These provisions, we think, are both an enlargement of and a limitation upon the authority of the court under the Ship Mortgage Act (46 U.S.C.A. § 952, supra).

In this case the government seeks all the benefits that it could obtain under Chapter XIV, but refuses to bear the burden that the court could have (and, we think, in view of the government's own showing as to the losses being incurred and the apparent insolvency of Universal, would have) imposed under that chapter.

■■ We do not doubt the standing of appellants to challenge the priority given the government's advances. Although appellants were given notice of the foreclosure action, they were not given notice of the proposed receivership or of its terms. This lack of notice did not necessarily deprive the court of jurisdiction to appoint a receiver (but see Rule 18(a), supra, Local Rules, Southern District of California). Their "default", entered following publication of notice of the libel, only admitted the right of the government to foreclose. (See Criscuolo v. Atlas Imperial Diesel Engine Co., 9 Cir., 1936, 84 F.2d 273). The court properly permitted them to intervene to assert their claims to that part of the proceeds of the sale which exceeded the mortgage debt. It was only then that the question of priorities had to be decided, and appellants then had standing to challenge the validity of charges upon the estate, claimed to be superior to their interests. (See Union Trust Co. v. Illinois Midland R. Co., 1886, 117 U.S. 434, 456, 6 S.Ct. 809, 29 L.Ed. 963; Coursey v. International Harvester Co., 10 Cir., 1940, 109 F.2d 774). More-

over, the order of November 18, 1954 under which the government's advances were made does not purport to give priority to the Maritime Administration over appellants. It provides only that the advances "shall * * * be a lien on said vessel * * * repayable out of revenues from the operation of said vessel * * *". Nor do we believe that any of appellants are barred by laches or estoppel. These are equitable doctrines, and the equities are, in our opinion, all on the side of appellants.

We conclude that the liens of appellants are superior to the claimed lien of the Maritime Administration for its advances (other than $8,000, to the priority of which appellants stipulated).

The decree is reversed and the matter is remanded for further proceedings consistent with this opinion.