GRAY, CARY, AMES & FRYE, Appellant

v.

HGN CORPORATION and BANCO NATIONAL PESQUERO PORTURARIO, S.A., Appellees

CREWMEMBERS of the COINSECO ALFA, Appellants

v.

M/V COINSECO ALFA, HGN CORPORATION and BANPESCA, Appellees

High Court of American Samoa
Appellate Division

AP No. 1-87
AP No. 4-87

October 23, 1987

Before KING*, Associate Justice, O'SCANNLAIN**, Associate Justice, VAIVAO, Associate Judge, and AFUOLA, Associate Judge.

Counsel: For Appellant Gray, Cary, Ames, & Frye, William Reardon
For Appellant Crewmembers, Aviata Fa'alevao
For Appellee HGN Corporation, Roy J.D. Hall, Jr.

Per O'SCANNLAIN, J.:

Gray, Cary, Ames & Frye ("Gray-Cary") and certain crew members of the M/V Coinseco Alfa ("Alfa") bring appeals from orders of the Trial Division in favor of appellees arising out of foreclosure of various maritime liens against the Alfa in the High Court.

FACTS

In late 1982 HGN advanced $7 million to Pacific Tuna Corporation ("PTC"). The loan was secured by a preferred mortgage on four tuna boats

---

* Honorable Samuel P. King, Senior Judge, United States District Court for the District of Hawaii, serving by designation of the Secretary of the Interior.

** Honorable Diarmuid F. O'Scannlain, Judge, United States Court of Appeals for the Ninth Circuit, serving by designation of the Secretary of the Interior.

owned by PTC including the _Alfa_. PTC defaulted in March 1983 and HGN thereupon brought this ship's libel action and secured the arrest of the _Alfa_ by the Marshal for the High Court of Samoa. On June 20, 1983, subsequent to the arrest of the _Alfa_, PTC purported to convey a preferred ship's second mortgage on the _Alfa_ to the Gray-Cary law firm in payment for legal services.

Later in 1983, still during the pendency of this proceeding, PTC and HGN entered into a stipulation agreement whereby the _Alfa_ would be allowed to undertake a single fishing voyage. The stipulation read in pertinent part as follows:

> Whereas, . . . HGN is not desirous of obtaining ownership of _Coinseco Alfa_ or any other vessel secured by the mortgage and . . . PTC is desirous of securing additional time to obtain financing for the vessel in order to clear the vessel of the mortgage and any other liens that may exist, it is hereby stipulated [that] the High Court of American Samoa . . . appoints . . . John Sawiki as the receiver . . . of the _Alfa_ to operate the vessel on
> one fishing trip commencing on or about November 20, 1983 and such future trips as the parties may mutually agree . . .
> (5) that the receivers are authorized to borrow up to $375,000 . . .
> (6) that the receivers shall compensate the crew by payment of a specified sum for each ton of tuna caught or on a share basis (pursuant to industry custom) from the proceeds if any of each trip . . .
> (10) that all expenses and debts incurred by the receivers pursuant to the terms of this [stipulation] shall be deemed to be expenses of administration and shall be paid prior to any claims . . .
> (12) [n]othing contained herein shall be construed to be a waiver of any rights which HGN may have against the vessel or its catch arising out of or under the mortgage or the security agreement with PTC or otherwise on the vessel . . . .

Pursuant to this stipulation and order, co-receiver John Sawiki hired a new crew for the _Alfa_, contracting with each for various shares of the proceeds of the catch in excess of 200 tons. There is no evidence that Sawiki was able to borrow funds

67

to outfit the vessel nor is there evidence that the crew advanced any funds which enhanced the value of the vessel. Although there were only 80,000 gallons of fuel in the ship's bunker, the captain was assured by Sawiki that additional fuel would be delivered to the Alfa on the fishing ground. Relying upon this promise, the captain and crew weighed anchor and commenced the voyage on March 7, 1984.

HGN apparently assumed that no fishing voyage would commence since the receiver was unable to borrow funds to outfit the Alfa. When HGN heard that the Alfa had embarked on a fishing trip, and without insurance, it made written demand for return of the vessel and filed suit when no response was forthcoming. Meanwhile, when no fuel was delivered to the vessel at the fishing grounds, the captain returned the Alfa to Pago Pago on April 5, 1984 with only 78 tons of tuna in the hold. As the tuna catch was below the threshold amount of the share agreement, the captain and crew left the vessel and received no remuneration.

## PROCEEDINGS IN TRIAL DIVISION

On May 16, 1985 certain members of the crew intervened in HGN's libel action against the Alfa, claiming that they were entitled to excess post-arrest wages from the ill-fated voyage. The trial court held that (1) at all times relevant to the case the Alfa was in custodia legis (2) the fishing venture was purely a for-profit expedition, not for preservation of the estate, and (3) the crew was limited by the stipulation only to a percentage of the catch, and had no valid claim for wages. Accordingly, summary judgment was granted to HGN. In an accompanying order, the court held that Sawiki acted outside the scope of the stipulation order and therefore any expenses arising from the voyage were not expenses of administration payable out of the res.

On December 5, 1986, the Trial Division entered an order granting summary judgment in favor of HGN and declaring null and void Gray-Cary's post-arrest mortgage on the Alfa for having been issued while Alfa was in custodia legis.

On January 20, 1987, the Alfa was sold at Marshal's auction.

68

## ANALYSIS

### I: TIMELINESS OF APPEAL

Gray-Cary filed its notice of appeal 31 days after judgement was entered but 7 days after motion for reconsideration was denied. Appellee argues that the appeal fails for lack of compliance with A.C.R. Rule 4(a)(1). Since the notice of appeal was filed within 10 days after the denial of the motion for reconsideration, we find the appeal timely.

### II: JURISDICTION OF HIGH COURT

Gray-Cary argues that the High Court of American Samoa lacked jurisdiction to arrest the _Alfa_ because the enforcement of preferred ship's mortgages has been granted exclusively to the district courts of the United States under 46 U.S.C. § 951. Relying upon <u>Star-Kist Samoa, Inc. v. The M/V Conquest</u>, 3 A.S.R.2d 25 (1986), it argues that since the High Court is not formed under Article III, it cannot foreclose on a ship's mortgage pursuant to the Ship Mortgage Act of 1920, 46 U.S.C. §§ 911-984.

> It is beyond dispute that the courts of this territory are not article III district courts. [citations omitted]. Nor has Congress vested our courts with the jurisdiction of a non-article III district court pursuant to the 'territorial exception.' <u>Northern Pipeline Co. v. Marathon Pipeline Co.</u>, 458 U.S. 50, 64-65 (1982). Rather, the High Court of American Samoa is a territorial court of discrete and limited jurisdiction, created pursuant to articles II and IV of the United States Constitution, and does not come within the plain meaning of 'district courts of the United States'."

<u>The Conquest</u>, <u>supra</u>, 3 A.S.R.2d at 27. Accordingly, since the High Court of American Samoa is not a U.S. district court, vessel owners cannot take advantage of the Ship Mortgage Act here. <u>Id</u>. at 29.

While this court cannot sit in admiralty under Article III, the Fono has provided us with admiral-

ty jurisdiction under A.S.C.A. § 3.0208(a)(3), which reads in pertinent part as follows:

> (a) The trial division of the High Court shall be a court of general jurisdiction with power to hear any matter not otherwise provided for by statute. Notwithstanding the forgoing, the trial division of the High Court shall have original jurisdiction of the following classes of cases and controversies:
>
> . . . .
>
> (3) Admiralty and maritime matters, of which the trial division shall have both in rem and in personam jurisdiction.

Admiralty jurisdiction need not be directly and specifically conferred upon territorial courts by Congress. In re Complaint of Interocean Ships, 2 A.S.R. 76, 83 (1985). Accordingly, while we lack jurisdiction to adjudicate a maritime foreclosure under 46 U.S.C. § 185, see M/V Conquest, 3 A.S.R. at 27-28, we have jurisdiction in admiralty to apply substantive principles of the maritime common law. See, e.g., Interocean Ships, 2 A.S.R. at 80. This court clearly had jurisdiction to determine the validity of a purported mortgage, even if it did not have jurisdiction to foreclose it.

Here, Gray-Cary claims that the Trial Division lacked in rem jurisdiction to arrest the Alfa and thus to foreclose her first mortgage. While it is correct that this court could not proceed under 46 U.S.C. § 951, see M/V Conquest, 3 A.S.R. at 27, we have subject matter jurisdiction over the Alfa under A.S.C.A. § 3.0208(a)(3). Interocean Ships, 2 A.S.R. at 80. Accordingly, the High Court had properly placed the Alfa in custodia legis at the time PTC delivered its second preferred mortgage to Gray-Cary. For that reason Gray-Cary's argument is devoid of merit; its mortgage on the Alfa was properly declared null and void by the High Court.

## III: CREW'S LIEN FOR LOST WAGES

### A. Custodia Legis

As a general principle, one who furnishes goods or services to a vessel in custodia legis does not acquire a maritime lien against the vessel for the value of such goods or services. See New York Dock v. The Poznan, 274 U.S. 117, 120 (1927); Gilmore & Black, Law of Admiralty, 602-03 (2d ed. 1975); 2 Benedict on Admiralty § 46, at 3-65 (7th ed. 1983). Consequently, no lien can attach to a vessel while she is in judicial custody. Donald D. Forsh Assoc. v. Transamerica, 821 F.2d 1556, 1560-61 (11th Cir. 1987). In other words, events subsequent to seizure of a vessel may not give rise to liens on that vessel while she is in custodia legis. Old Point Fish Co. v. Haywood, 109 F.2d 703, 705-06 (4th Cir. 1940).

However, "[t]he rule excluding subsequent liens cannot be extended to vessels that are neither actually nor constructively in the marshal's possession." The Young America, 30 F. 789, 791 (S.D.N.Y. 1887). In Young America, a tugboat was placed in custodia legis following an accident but allowed to ply the harbors in furtherance of its trade without restriction. Id. at 789. "In effect, the vessel was not in the custody of the court at all." Id. at 790. The court thus held that additional liens accrued against the vessel after seizure could be levied in rem against the tug, since the original lien had never been enforced. Id. at 792. This principle was followed by the Ninth Circuit in Northwest Marine v. United States, 307 F.2d 537 (9th Cir. 1962). There, the court held that liens of a libeled vessel's crew can take precedence over the prior liens of the government.[1] Significantly,

---

[1] "We hold . . . that when the government, as mortgagee, elected, instead of foreclosing, to continue the operation of the vessel, for its own purposes and benefit, it did so at its own risk, and not at that of appellant lienholders. It would be grossly unfair to permit the government, by proceedings that were essentially ex parte as to [the] appellants, to put the ship on the high seas on whatever terms it might choose, as a sort of floating credit card payable to the bearer,

however, though the crew members there had obtained their liens subordinate to the government, they _already_ held valid maritime liens when the foreclosure libel was filed. 307 F.2d at 539.

B. Lost Wages

"Seamen are wards of admiralty and as such the courts of admiralty vigilantly guard against any encroachment of their rights." _Putnam v. Lower_, 236 F.2d 561, 569-70 (9th Cir. 1956). "[D]espite compensational differences, lay fisherman or sharesman possess a right similar to that enjoyed by regular seamen to lien the vessel and catch on board to secure their compensation." _Id._ at 570. Accordingly, a fisherman's right to libel a vessel for his share of the catch is not lost when, due to the vessel's negligence, no catch is obtained. _Id._; _Carbone v. Ursich_, 209 F.2d 178, 183 (9th Cir. 1953). _But see_ _Old Point Fish Co. v. Hayward_, 109 F.2d 703, 706 (4th Cir. 1940) (fisherman's expected percentage of unrealized catch too speculative to allow maritime lien on vessel).

However, the interest in protecting a seaman's wages does not supersede the principle of _custodia legis_. Therefore, "[i]t is well settled that no maritime lien can be allowed to seamen for wages accruing subsequent to the time the ship is taken into _custodia legis_ . . . The theory here is that the act of seizing a ship, pursuant to legal process, effectively terminates the voyage, and thereby discharges the crew with no further claim for wages . . . . _Putnam_, 236 F.2d at 570 (footnote omitted). Thus, "seamen's wage claims are only effective for those services performed prior to libel." _Irving Trust v. The Golden Sail_, 197 F. Supp. 777, 780 (D. Or. 1961) (unpaid wages of crew for period after arrest of vessel does not give rise to maritime lien for wages). _See also_ _Collie v. Ferguson_, 281 U.S. 52 (1930); _Old Point Fish_, 109 F.2d at 705. _But see_ _The Herbert Rawding_, 55 F. Supp. 156, 162-63 (E.D.S.C. 1944) (seamen entitled to payment on quantum meruit basis for services rendered after they filed their libel.)

---

presumably able to incur maritime liens which would ordinarily, because later in time, prevail over those of appellants." _Northwest Marine_, 307 F.2d at 541.

72

Here, the stipulation agreement under which the _Alfa_ was allowed to proceed expressly provided that the court retained custody over the vessel. _Cf._ _The Young America_, 30 F. at 790. The stipulation was limited to a single' fishing expedition under specified terms and conditions. _Id._ The _Alfa_ did not ply the seas in her usual custom but rather was at all times in constructive possession of the court. _Id._ Indeed, HGN did not even know of the voyage until the vessel had weighed anchor and immediately brought suit to halt the ill-fated trip.

More importantly, the vessel was _already_ under arrest when the crew was hired. _Cf._ _Northwest Marine_, 307 F.2d at 539. While the crew may have been able, under normal circumstances, to attach a maritime lien for wages on the basis of their unrealized catch, _see_ _Putnam_, 236 F.2d at 570, the fact that the ship was already _in custodia legis_ precluded any such wage lien. _Id._ at 570; _Irving Trust_, 197 F. Supp. at 789. Because the crew's claim arose after the _Alfa_ was placed _in custodia legis_, as a matter of law, the crew is estopped from obtaining a maritime lien for lost wages. _Cf._ _Putnam_, 236 F.2d at 570 (shipowner wrongfully abandoned percentage contracts before vessel entered _custodia legis_).

## IV: CREW'S EXPENSE OF ADMINISTRATION CLAIM

While the general rule precludes securing liens on vessels _in custodia legis_, "[t]he most elementary notion of justice would seem to require that service or property furnished upon the authority of the court. . . for the common benefit of those interested in a fund administered by the court should be paid from the fund as an 'expense of justice.'" _New York Dock_, 274 U.S. at 121 (emphasis added). While no lien can attach to a vessel while she is in judicial custody, services or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court, has a claim to reimbursement from the sales proceeds, ahead of all lienors.[2] Donald D.

_____

[2] Though expenditures while a vessel is _in custodia legis_ do not give rise to maritime liens, an admiralty court has equitable power to grant priority to claims arising from administration of property within the court's

Forsh, 821 F.2d at 560-61; General Elec. Credit v. Drill Ship Mission Exploration, 668 F.2d 811, 815-16 (5th Cir. 1982). Compare United States v. M/V Andoria, 570 F. Supp. 413, 415-16 (E.D. La. 1983) (maritime lien against vessel for repairs, services, and other necessaries primed government's claim for expenses for services or property furnished with respect to vessel prior to seizure) with Kingstate Oil v. M/V Green Star, 815 F.2d 918, 923-24 (3d Cir. 1987) (expenses incurred when ship's charterer unloaded vessel's cargo after its arrest were not entitled to preferential classification as administrative expenses where unloading was for sole benefit of charterer and consignee and did not benefit any other party).

Nevertheless, from the evidence in the record, we conclude that outfitting of the Alfa was in furtherance of the profit-making voyage and added no recognizable value to the res. Thus, the crew is not entitled to any reimbursement. See Kingstate Oil, 815 F.2d at 923-24.

CONCLUSION

The Marshal of the High Court of American Samoa properly arrested the Alfa under the maritime jurisdiction of the territory. Thus, the vessel was in custodia legis when the purported second preferred mortgage to Gray-Cary was issued. Accordingly, the trial court properly held this second mortgage null and void.

The crew members' claims accrued after the vessel's arrest. Thus, the maritime common law principle favoring seaman's wages is superseded by the doctrine of custodia legis. Further, because the fishing expedition was a for-profit expedition, wage claims cannot be recognized as administrative expenses. Therefore, the Trial Division's orders are AFFIRMED.

jurisdiction. Payne v. SS Tropic Breeze, 423 F.2d 236, 239 (1st Cir. 1970).