889 F.2d 233
 1990 A.M.C. 316, 58 USLW 2301, 19
Bankr.Ct.Dec. 1601,
Bankr. L. Rep. P 73,153
 UNITED STATES of America, Plaintiff-Appellee,
v.
ZP CHANDON, Official No. 650657; ZP Caymus, Official No.
647398; ZP Chalone, Official No. 644531; ZP Condon,
Official No. 641296; ZP Montelena, Official No. 652154; ZP
Montali, Official No. 653451; In rem; Tractug Associates,
Defendants-Appellees,
v.
Daniel J. BORIOLO; Paul Carter; Kevin Boyle; Norbert
Seddon; Mark Alioto; Phil Hammond; Tor Valentinsen;
Michael McCarthy; M. Heckel; Scott Fuller; Richard
Colonna; Mark Lund; John Becker; Devin Dede; Mike
Byrnes; Eric Wallischek; Paul Michna; Eileen Heneghan;
Terry Edwards; Arnold Drumm; Tom Evers; Joseph Maggiora;
Donald Gates; Tom Power; Harold Jacobson; Steve Rush;
Carol Meyers; Keith Kridler; Steven Hamre; Hugh Stephens;
Mark Sherman; Steve Mitchell, Plaintiffs-Intervenors-Appellants.
 No. 88-3980.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 12, 1989.
Decided Nov. 6, 1989.
 
 George H. Luhrs, Seattle, Wash., for plaintiffs-intervenors-appellants.
 R. Michael Underhill, Asst. U.S. Atty., Torts Branch, Civ. Div., San Francisco, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Western District of Washington (Seattle).
 Before BROWNING, ALARCON and HALL, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 The plaintiff-intervenors (the crew members) appeal from the order granting summary judgment to the United States on all claims for seamen's wages filed by the crew members. Judgment was entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. The district court concluded that the automatic stay provisions of 11 U.S.C. Sec. 362(a)(4) precluded the creation of a lien for seamen's wages earned after the filing of a petition for reorganization under Chapter 11 of the Bankruptcy Act. 11 U.S.C. Secs. 301, 362(a)(4) (1988).
 
 
 2
 We must decide whether a claim for seamen's wages earned after the filing of a petition for reorganization under Chapter 11 has priority over a preferred ship mortgage. We reverse because we have concluded that in enacting the Bankruptcy Act, Congress did not intend to repeal or invalidate sub silentio the priority rules of maritime law.
 
 
 3
 * On October 1, 1981, Tractug Associates, a California Limited Partnership (Tractug), obtained a loan from the Federal Maritime Administration (MARAD) to finance the construction of three vessels, the ZP Chandon, the ZP Chalone, and the ZP Montelena. Tractug executed United States Government guaranteed ship financing notes in the amount of $17,320,000. These notes were secured by a first preferred fleet mortgage which was supplemented to include each ship as construction was completed.
 
 
 4
 On September 30, 1983, Tractug defaulted in making the payments required by the notes. Upon Tractug's failure to remedy the default within 30 days, MARAD had the right to foreclose on its first preferred fleet mortgage.
 
 
 5
 On December 12, 1983, the United States filed an admiralty action in the United States District Court for the Northern District of California (No. C 88-3540), pursuant to Subchapter XI of the Merchant Marine Act of 1936, 46 U.S.C.App. Secs. 1271-1279b (1988), to foreclose its first preferred fleet mortgage against the ZP Montelena, the ZP Chalone, the ZP Condon, the ZP Chandon, and the ZP Caymus, Tractug, Tractug Marine Corporation, and Thomas S. Faust, Jr.
 
 
 6
 On the same day, the United States filed an identical complaint in the United States District Court for the Central District of California against two vessels located in the Los Angeles area. These vessels were in the jurisdiction of the Central District of California.
 
 
 7
 The United States Marshal arrested the ZP Condon on December 12, 1983. The ZP Chandon was arrested the following date.
 
 
 8
 On December 13, 1983, Tractug filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Act in the Northern District of California. The vessels were released from arrest due to the automatic stay provision of 11 U.S.C. Sec. 362(a)(4).
 
 
 9
 The United States sought relief from the automatic stay in the bankruptcy court for the purpose of prosecuting its pending admiralty foreclosure action. After six weeks of hearings, the bankruptcy court denied the motion for relief from the automatic stay.
 
 
 10
 The bankruptcy court approved a wage deferral agreement entered into on October 24, 1984, by the International Organization of Masters, Mates and Pilots (MMP) and the owners of the vessels, Tractug and Faustug Marine Corporation (Faustug), which permitted the vessels to continue to operate around San Francisco, California, and Seattle, Washington. The wage deferral agreement provided that Tractug would pay $165 per day to each Master (tugboat captain), $132 per day to each mate, and $100 per day (base wages) to each deckhand for one year commencing October 24, 1984. Tractug and Faustug agreed to pay deferred compensation in one year. The bankruptcy court ordered the ship owners to pay the deferred wages into an escrow account in order to protect the mortgage interest of the United States.
 
 
 11
 On November 21, 1985, the United States Bankruptcy Court for the Northern District of California granted the renewed motion of the United States for relief from the automatic stay.
 
 
 12
 On December 13, 1985, the United States Bankruptcy Court for the Northern District of California issued an order granting relief from the automatic stay to MMP and each of its members to allow them to intervene in any foreclosure action.
 
 
 13
 Three of the vessels sailed from San Francisco to Puget Sound during the pendency of the automatic stay. The United States brought this admiralty foreclosure action in rem against the five aforementioned vessels and the ZP Montali on December 18, 1985, in the United States District Court for the Western District of Washington in Seattle to foreclose on its first preferred fleet mortgage (No. CV 85-2437 CRD).
 
 
 14
 The crew members filed a motion to intervene in the Seattle admiralty action pursuant to Federal Rule of Civil Procedure 24(a) on January 16, 1986. On March 18, 1986, the United States District Court for the Northern District of California issued an order in the pending admiralty action filed by the United States on December 12, 1982 (No. C 88-3440) permitting the MMP and the individual employees listed in the motion for intervention to be heard with respect to their claims against the defendant vessels. Crew members sought to enforce maritime liens totaling $665,244.77 arising from wages earned prior to the automatic stay, wages deferred pursuant to the agreement approved by the bankruptcy court, and unpaid contributions to employee benefit plans. Pursuant to the request of the parties on March 29, 1986, the district court in Seattle consolidated the admiralty action before it (No. CV 85-2437 CRD) with the admiralty action initially brought in the United States District Court for the Northern District of California (No. C 88-3540).
 
 
 15
 On May 23, 1986, the United States District Court for the Western District of Washington at Seattle issued an order for the sale of the vessels ZP Chandon, ZP Montelena and ZP Chalone, after the United States Marshal arrested these vessels. The court ordered that "all properly filed and perfected maritime liens and other interests permitted by law in accordance with orders of this Court related thereto, shall attach to the net proceeds of the sales of the individual defendant vessels, insofar as any said liens or interests have already attached to any of the individual in rem defendants at the time of the sales ordered herein."
 
 
 16
 On July 18, 1986, the United States District Court for the Northern District of California issued an order for the sale of the vessel ZP Condon. The court further ordered that if the United States is the successful bidder, the United States shall be liable for the payment of "(1) valid maritime liens and (2) valid maritime liens having priority over the mortgage interest of the United States."
 
 
 17
 The United States moved for partial summary judgment in the consolidated admiralty actions against plaintiffs-in-intervention on February 11, 1988. The United States argued that the filing of the bankruptcy petition on December 13, 1983 invalidated the post-petition claims of plaintiffs-inintervention. In addition, the United States contended that the claims for unpaid contributions for benefit plans do not give rise to preferred maritime liens. On that same date, the crew members moved for partial summary judgment.
 
 
 18
 On April 1, 1988, the district court filed a memorandum and order granting summary judgment in favor of the United States and granted in part and denied in part the motion for summary judgment of crew members. Judgment was entered on May 18, 1988, pursuant to Federal Rule of Civil Procedure 54(b) in favor of defendants on the crew members' claims for unpaid wages earned after December 13, 1983, the date the automatic stay went into effect. The crew members filed a timely notice of appeal on July 5, 1988.
 
 II
 
 19
 We review an order granting summary judgment independently and without deference to the legal conclusions of the district court. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986).
 
 
 20
 The issue before us involves a conflict between the rights of a seaman under admiralty law and the protection accorded debtors under our bankruptcy laws. The crew members argue that under maritime law a seaman's claim for wages is entitled to the proceeds of the sale of a ship over all persons. The United States argues with equal force that the automatic stay provisions of the Bankruptcy Act make the seamen's maritime liens unenforceable as to wages earned after the date a petition for reorganization is filed. We must decide whether the enactment of the Bankruptcy Act and the Congressional grant of jurisdiction to the bankruptcy courts restricts the district court's jurisdiction in admiralty or maritime cases.
 
 
 21
 The United States Constitution clearly distinguishes cases in law and equity from cases involving admiralty and maritime jurisdiction. Long ago, in 1828 the Supreme Court explained this distinction in American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828) in the following words:
 
 
 22
 The constitution and laws of the United States give jurisdiction to the district courts over all cases in admiralty; but jurisdiction over the case, does not constitute the case itself. We are, therefore, to inquire, whether cases in admiralty, and cases arising under the laws and constitution of the United States, are identical. If we have recourse to that pure fountain from which all the jurisdiction of the federal courts is derived, we find language employed which cannot well be misunderstood. The constitution declares, that "the judicial power shall extend to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, or other public ministers and consuls; to all cases of admiralty and maritime jurisdiction." The constitution certainly contemplates these as three distinct classes of cases; and if they are distinct, the grant of jurisdiction over one of them, does not confer jurisdiction over either of the other two. The discrimination made between them, in the constitution, is, we think, conclusive against their identity. If it were not so, if this were a point open to inquiry, it would be difficult to maintain the proposition that they are the same. A case in admiralty does not, in fact, arise under the constitution or laws of the United States. These cases are as old as navigation itself; and the law admiralty and maritime, as it has existed for ages, is applied by our courts to the cases as they arise.
 
 
 23
 Id. 26 U.S. at 545-46.
 
 
 24
 American Insurance Co. teaches us that in determining whether seamen have a lien priority over the claims of all other creditors, we must look to admiralty and maritime law, not the law that governs transactions occurring on land. In In re Pacific Caribbean Shipping (USA), Inc., 789 F.2d 1406 (9th Cir.1986), we held that the Uniform Commercial Code "should not be interpreted to apply to [maritime] liens." Id. at 1408. We also pointed out the distinction between liens arising under maritime law and those resulting from ordinary business transactions:
 
 
 25
 In the leading treatise on maritime law, it is pointed out that maritime liens have extraordinarily little in common with land liens, including consensual security interests. G. Gilmore & C. Black, The Law of Admiralty 586-89 (2d ed. 1975). Land liens and maritime liens are "two unlike things ... called by the same name." Id. at 589. In particular, it is well-established that maritime liens are secret and unrecorded, that is, they are valid without possession or filing, while Article 9 security interests do require filing or possession. Id. at 586-89. Furthermore, maritime liens generally have priority in reverse chronological order, while Article 9 security interests generally have priority in normal chronological order. Id. Thus, it is most unlikely that the drafters of the U.C.C. intended to create a single statute that would apply in an identical manner to both personal property financing on land and to maritime liens. It is even more unlikely that the drafters would have neglected to mention an intention to entirely rewrite the long-standing filing and priority rules of maritime law.
 
 
 26
 Id. at 1407.
 
 
 27
 Seamen's claims for wages are generally deemed "sacred liens, and, so long as a plank of the ship remains, the sailor is entitled, against all other persons to the proceeds as a security for his wages." G. Gilmore & C. Black, supra, at 627 (citing The John G. Stevens, 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969 (1898)).
 
 
 28
 Congress has recognized that the earning of seamen's wages gives rise to a preferred maritime lien. 46 U.S.C. Sec. 953(a) (repealed by Title I, Sec. 106(b)(2) of Pub.L. 100-710, 102 Stat. 4751, effective January 1, 1989). A maritime lien for unpaid seamen's wages has priority over a preferred mortgage lien. 46 U.S.C. Sec. 953(b) (repealed 1989); All Alaskan Seafoods, Inc. v. M/V Sea Producer, 882 F.2d 425, 428 (9th Cir.1989).
 
 
 29
 The district court in the instant matter concluded that the seamen's maritime lien did not have priority over the first preferred fleet mortgage as to wages earned but unpaid after December 12, 1983 because of the automatic stay provisions of section 362(a)(4) of the Bankruptcy Act. Section 362(a)(4) provides in pertinent part:
 
 
 30
 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of--
 
 
 31
 ....
 
 
 32
 (4) any act to create, perfect, or enforce any lien against property of the estate.
 
 
 33
 11 U.S.C. Sec. 362(a)(4) (1988).
 
 
 34
 Section 362(a)(4) does not expressly refer to maritime liens. Liens are defined in section 101(33) of the Bankruptcy Act. 11 U.S.C. Sec. 101(33) (1988). Section 101(33) provides that a statutory lien is a charge against an interest in property "arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute." 11 U.S.C. Sec. 101(47) (1988).
 
 
 35
 The United States argues that "consensual maritime liens such as wages of crew are statutorily codified liens, the latter of which are expressly included within the Code's definition of lien. 11 U.S.C. Sec. 101(47)." Brief of Appellee at 13. We disagree. A seaman's lien for wages existed under maritime law long before Congress enacted the Bankruptcy Act.
 
 
 36
 The United States argues that in applying the automatic stay to "any lien," in section 362(a)(4), Congress intended to include a maritime lien for seamen's wages. The United States' reliance on In re Alberto, 823 F.2d 712, 722 (3rd Cir.1987) for this proposition is misplaced. In re Alberto does not involve a maritime lien for wages. The Third Circuit held in In re Alberto that a preferred ship mortgage would not be entitled to priority if it was not perfected until after the filing of the petition in bankruptcy. Id. at 723. A maritime lien for wages is not subject to any filing or recording requirements. In re Pacific Caribbean Shipping (U.S.A.), Inc., 789 F.2d at 1407. G. Gilmore & C. Black, supra at 587-89.
 
 
 37
 We decline to speculate that Congress may have intended to include maritime liens for seamen's wages within the words "any liens" in section 362(a)(4) of the Bankruptcy Act. Maritime liens for seamen wages have priority over a preferred ship mortgage, and are "sacred liens" entitled to protection "as long as a plank of the ship remains." The John Stevens, 170 U.S. 113, 119, 18 S.Ct. 544, 547, 42 L.Ed. 969 (1898). To paraphrase our words in In re Pacific Caribbean Shipping (U.S.A.), Inc., it is unlikely that the drafters of the Bankruptcy Act would have casually neglected to express its intention to rewrite a "sacred" principle of maritime law. See id. at 1407. We construe Congress' omission of any reference to maritime law in section 362(a)(4) as evidence of its intention to limit the reach of that statute to land-based transactions where (1) a recording of a lien interest is required and (2) the creditor first in time is entitled to priority. The district court erred in holding that the automatic stay provisions of the Bankruptcy Act apply to seamen's wages.
 
 III
 
 38
 The United States argues that we can uphold the order of the district court on the basis of the "floating credit card" doctrine discussed in our opinion in Northwest Marine Works v. United States, 307 F.2d 537 (9th Cir.1962). This doctrine was argued before the district court. The district court did not reach the issue.
 
 
 39
 Northwest Marine Works is inapplicable to the facts before this court. In Northwest Marine Works, an admiralty foreclosure proceeding was filed by the United States. The vessel was loaded with a cargo of coal destined for Japan. The United States then elected to permit the vessel to continue operating without notice to other known creditors. Such notice was required under local rule. During the continued operation of the vessel, the United States advanced monies to be used to pay the wages of the crew. After the foreclosure sale, the United States sought to enforce the priority of the seamen in seeking reimbursement for the amount of money it advanced to the seamen. See id. at 539-40. We held that it would be inequitable for the United States as mortgagee to continue the operation of the vessel for its own benefit instead of foreclosing, while passing on the cost or risks to other creditors who had no notice of the government's election. Id. at 541. Our decision in Northwest Marine Works was narrowly circumscribed. We noted that "[w]e do not decide whether, or under what circumstances, third parties furnishing services or supplies to the vessel could have obtained liens thereon, nor whether the advances made by the government would, in other circumstances, entitle the government to a preferred lien." Id.
 
 
 40
 In the matter sub judice, the crew members had no power to compel a foreclosure sale in the admiralty proceedings, so that no further liens with higher priority would be created. The bankruptcy court ordered the release of the arrested vessels after the petition for reorganization was filed pursuant to section 362(a)(4). The record does not support the claim of the United States that the crew members acted inequitably in working on vessels operated by a debtor attempting to effect a reorganization of his business. Thus, the proceeds of the foreclosure sale must be distributed according to the priorities established under maritime law.
 
 CONCLUSION
 
 41
 The automatic stay provisions of Section 362(a)(4) do not apply to a maritime lien for seamen's wages earned after the filing of a petition for reorganization pursuant to the Bankruptcy Act. The district court must distribute the funds received from the foreclosure sale according to the priorities established under maritime law. The mere fact that crew members continue to work during the period of time allowed to the debtor to attempt to reorganize his business affairs under a contract calling for additional pay does not demonstrate inequitable conduct justifying an extinction of their maritime lien priority.
 
 
 42
 REVERSED and REMANDED.